478 F.2d 772
 Howard B. LEVY, Appellant,
v.
Jacob J. PARKER, as Warden of the United States
Penitentiary, Lewisburg, Pennsylvania, and Stanley
R. Resor, as Secretary of the Army.
 No. 71-1917.
 United States Court of Appeals,
Third Circuit.
 Argued Dec. 12, 1972.
Decided April 18, 1973.
 
 Charles Morgan, Jr., Norman Siegel, Morris Brown, Emily Carssow, Neil Bradley, Reber F. Boult, Jr., Atlanta, Ga., Laughlin McDonald, Columbia, S. C., George W. Dean, Jr., Destin, Fla., Ambrose R. Campana, Williamsport, Pa., for appellant; Anthony G. Amsterdam, Stanford, Cal., Alan H. Levine, Burt Neuborne, Melvin L. Wulf, New York City, of counsel for appellant.
 S. John Cottone, U. S. Atty., Harry A. Nagle, Asst. U. S. Atty., M. D. Pennsylvania, Lewisburg, Pa., William A. Pope, Crim. Div. Dept. of Justice, Washington, D. C., Arnold I. Melnick, Lieutenant Colonel, JAGC, Royce C. Lamberth, Captain, JAGC, Dept. of the Army, Washington, D. C., for appellee Parker.
 Before SEITZ, Chief Judge, and ALDISERT and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ALDISERT, Circuit Judge.
 
 
 1
 This appeal requires us to decide whether Articles 133 and 134 of the Uniform Code of Military Justice, 10 U. S.C. Secs. 933, 934, fail to satisfy the standards of precision required by the due process clause, and, hence, are void for vagueness. The question arises in the context of an appeal from the denial of a petition for habeas corpus brought by appellant Levy when he was confined in the United States Penitentiary at Lewisburg, Pennsylvania, following conviction by a general court-martial.
 
 
 2
 Captain Howard B. Levy, an Army doctor on active duty at Fort Jackson, South Carolina, was charged with violating Articles 90, 133 and 134 of the Uniform Code of Military Justice. Article 90, 10 U.S.C. Sec. 890, provides in pertinent part: "Any person subject to this chapter who . . . willfully disobeys a lawful command of his superior commissioned officer: shall be punished . . . by such punishment other than death as the court-martial may direct." The specification under the Article 90 charge read:
 
 
 3
 In that Captain Howard B. Levy, U. S. Army, Headquarters & Headquarters Company, United States Army Hospital, Fort Jackson, South Carolina, having received a lawful command from Colonel Henry F. Fancy, his superior officer, to establish and operate a Phase II Training Program for Special Forces AidMen in dermatology in accordance with Special Forces AidMen (Airborne), 8-R-F16, Dermatology Training, did, at the United States Army Hospital, Fort Jackson, South Carolina, on or about 11 October 1966 to 25 November 1966, willfully disobey the same.
 
 
 4
 Article 133, 10 U.S.C. Sec. 933, states in pertinent part: "Any commissioned officer . . . who is convicted of conduct unbecoming an officer and a gentleman shall be punished as a court-martial may direct." Article 134, 10 U.S.C. Sec. 934, provides:
 
 
 5
 Though not specifically mentioned in this chapter, all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces, and crimes and offenses not capital, of which persons subject to this chapter may be guilty, shall be taken cognizance of by a general, special, or summary court-martial, according to the nature and degree of the offense, and shall be punished at the discretion of that court.
 
 
 6
 The charges under Articles 133 and 134 emanated from public statements made by Levy to enlisted personnel, of which the following is illustrative:
 
 
 7
 The United States is wrong in being involved in the Viet Nam War. I would refuse to go to Viet Nam if ordered to do so. I don't see why any colored soldier would go to Viet Nam; They should refuse to go to Viet Nam and if sent should refuse to fight because they are discriminated against and denied their freedom in the United States, and they are sacrificed and discriminated against in Viet Nam by being given all the hazardous duty and they are suffering the majority of casualties. If I were a colored soldier I would refuse to go to Viet Nam and if I were a colored soldier and were sent I would refuse to fight. Special Forces personnel are liars and thieves and killers of peasants and murderers of women and children.[1]
 
 
 8
 Captain Levy was convicted of (1) wilful disobedience of the lawful command of his superior officer, (2) uttering public statements designed to promote disloyalty and disaffection among the troops, and (3) "wrongfully and dishonorably making intemperate, defamatory, provoking, contemptuous, disrespectful and disloyal statements" to enlisted personnel, the latter two offenses constituting "conduct unbecoming an officer and a gentleman," and "disorders and neglects to the prejudice of good order and discipline in the armed forces." 10 U.S. C. Secs. 933, 934. He was sentenced to dismissal from the service, forfeiture of all pay and allowances, and confinement for three years at hard labor. Thereafter, Levy exhausted his appeals within the military.[2] Moreover, before, during and after the military proceedings he sought relief in the federal civilian courts.[3] Finally, he filed a petition for habeas corpus alleging constitutional deprivations in the court-martial proceeding.
 
 
 9
 Preliminarily, we observe that although the court-martial found appellant guilty of charges and specifications under three articles, the court announced on general sentence for the combined charges. The general rule governing a single sentence imposed upon convictions on several charges is that the sentence will be upheld on appeal if any one of the convictions is valid, and the sentence imposed is within the statutorily authorized maximum for the valid conviction, despite the fact that convictions on the other charges may not be valid. Claasen v. United States, 142 U.S. 140, 12 S.Ct. 169, 35 L. Ed. 966 (1891). This rule is applicable to federal habeas corpus review of a court-martial conviction and sentence. Carter v. McClaughry, 183 U.S. 365, 384-385, 22 S.Ct. 181, 46 L.Ed. 236 (1902); Hunsaker v. Ridgely, 85 F. Supp. 757 (D.Me.1949). However, the rule is not jurisdictional in nature. Rather, its application is discretionary. Benton v. Maryland, 395 U.S. 784, 789-792, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); Smith v. United States, 118 U. S.App.D.C. 235, 335 F.2d 270, 272 n. 2 (1964). Indeed, in Benton, the Supreme Court recognized that application of the general sentence rule has been "somewhat haphazard," and this court has observed that Benton "put into doubt" the continuing validity of that rule. United States v. McKenzie, 414 F.2d 808, 811 (3d Cir. 1969). In any case, the peculiarities associated with a sentence imposed by a military court render this case appropriate for discretionary refusal to apply the Claasen general sentence rule.[4] Because detention was mandated as a result of a general sentence under all three articles, it is impossible to isolate the sentence pronounced under a constitutionally valid provision from one announced under an invalid one. Therefore, we have the responsibility of inquiring whether one or more of these articles are defective.
 
 I.
 
 10
 Initially, it is necessary to identify the limited contours of a civilian court's jurisdiction when presented with a habeas corpus petition from a federal prisoner whose incarceration was ordered by a court-martial. Our statement of this issue is deliberate, for we avoid the imprecise label "review."[5] Title 10 U.S.C. Sec. 876 provides that military criminal proceedings shall be "final and conclusive," and "binding upon all departments, courts, agencies, and officers of the United States." That is, as in the case of petitions for habeas corpus filed by state prisoners under 28 U. S.C. Sec. 2254, where there is no jurisdiction to review the state judgment, here there can be no review of the final judgment of the court-martial. Naturally, however, a federal court has jurisdiction to examine state prisoner habeas corpus cases, and the basis of this jurisdiction was made clear in Fay v. Noia, 372 U.S. 391, 430-431, 83 S.Ct. 822, 844, 9 L.Ed. 2d 837 (1963): "The jurisdictional prerequisite is not the judgment of a state court but detention simpliciter. . . . Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him. Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner. Medley, Petitioner, 134 U.S. 160, 173 [10 S. Ct. 384, 388, 33 L.Ed. 835]." Thus the federal court inquiry into "detention simpliciter" is not, jurisprudentially speaking, a review of the state judgment, but an inquiry into whether the constitutional rights of the prisoner were properly vindicated in the proceedings which caused his detention.
 
 
 11
 Accordingly, the Supreme Court has held that the rigid proscription of 10 U. S.C. Sec. 876 erects no bar to a civilian court's habeas corpus jurisdiction in the case of a federal prisoner incarcerated under the sentence of a court-martial. Gusik v. Schilder, 340 U.S. 128, 71 S.Ct. 149, 95 L.Ed. 146 (1950).[6] But unlike the extensive authority conferred in state prisoner habeas cases by Fay v. Noia, supra, and Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the contours of civilian court jurisdiction in court-martial cases still remain ill-defined. The most instructive treatment on this issue is the Supreme Court's decision in Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953), where the Court stated that the duty of a federal court to protect individual constitutional rights is not diminished merely because a judicial proceeding has been conducted by the military:[7]
 
 
 12
 In military habeas corpus cases, even more than in state habeas corpus cases, it would be in disregard of the statutory scheme if the federal civil courts failed to take account of the prior proceedings-of the fair determinations of the military tribunals after all military remedies have been exhausted. Congress has provided that these determinations are 'final' and 'binding' upon all courts. We have held before that this does not displace the civil courts' jurisdiction over an application for habeas corpus from the military prisoner. Gusik v. Schilder, 340 U.S. 128 [,71 S.Ct. 149, 95 L.Ed. 146] (1950). But these provisions do mean that when a military decision has dealt fully and fairly with an allegation raised in that application, it is not open to a federal civil court to grant the writ simply to reevaluate the evidence. Whelchel v. McDonald, 340 U.S. 122 [, 71 S.Ct. 146, 95 L.Ed. 141] (1950).
 
 
 13
 346 U.S. at 142, 73 S.Ct. at 1049.
 
 
 14
 The government would have us interpret Burns to stand for the proposition that collateral review of military proceedings by federal civilian courts extends only to the traditional elements of jurisdiction, that is, whether the courtmartial was properly constituted, possessed jurisdiction over the person and the offense, and had power to impose the sentence, but not to constitutional errors which would oust the military of jurisdiction. Furthermore, the government continues, even if this court's jurisdiction extends to an examination of constitutional errors, our review is complete upon a finding that the military court has considered appellant's constitutional claims, even if its conclusions are erroneous.
 
 
 15
 This interpretation reflects the view taken in Ex parte Reed, 100 U.S. 13, 25 L.Ed. 538 (1879), where the Court held that the writ was limited to an inquiry into whether the court-martial had jurisdiction to try the matter and the power to impose sentence. Under such an approach, constitutional errors were deemed to oust the court of jurisdiction. However, this approach has been rejected in Kauffman v. Secretary of the Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991 (1969), cert. denied, 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970), and it is clear to this court that the law has progressed a long way from Reed.[8]
 
 
 16
 Undaunted, the government suggests that its position is vindicated by our decision in United States ex rel. Thompson v. Parker, 399 F.2d 774, 776 (3d Cir. 1968), cert. denied, 393 U.S. 1059, 89 S.Ct. 701, 21 L.Ed.2d 701 (1969): "Under the principle announced in Burns, therefore, the district court, after determining that the military courts had given due consideration to petitioner's contentions, quite correctly refused to review and reevaluate the facts surrounding petitioner's allegations." The government's reliance is misplaced for this argument overlooks the critical word "due" in the expression "due consideration." Indeed, any suggestion that Thompson imposes a standard of review different from that devised by Burns, ignores the language in Thompson immediately following that court's statement of the controlling rule: " 'Burns is the law of the land.' And both this court and the district courts must abide by its teaching." 399 F.2d at 777. Thus, a fair reading of Thompson compels the conclusion that "due consideration" is but a paraphrase of the Burns requirement that the civilian court must be satisfied that the military courts have "dealt fully and fairly" with the allegations of constitutional deprivation.[9]
 
 
 17
 We are persuaded, therefore, that the district court had sufficient authority to meet the constitutional challenges to Articles 133 and 134 presented by appellant. Several reasons support this conclusion. First, if we accept the contention that a civilian court can only review the proceedings to determine whether the court-martial had "jurisdiction," recourse can be had to the Supreme Court's development of this concept when jurisdiction vel non was the sole test in a state prisoner's habeas inquiry. Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717 (1879), held that although the writ would issue only if the court that committed the prisoner lacked "jurisdiction" to do so, the state court did lack such jurisdiction if the statute creating the offense for which the prisoner was tried was unconstitutional.
 
 
 18
 Siebold saw a degree of expansion in Moore v. Dempsey, 261 U.S. 86, 43 S.Ct. 265, 67 L.Ed. 543 (1923), where, although the statute under which appellant was tried was constitutional, the trial court nevertheless lost jurisdiction where the proceedings, though formally proper, were held under the sway of mob rule. Therefore, a prisoner convicted and sentenced at a trial in which "counsel, jury and judge were swept to the fatal end by an irresistible wave of public passion," was entitled to federal habeas corpus relief. Much to the same effect was Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), where the Court granted the writ to an individual convicted in state court on the basis of testimony known by the prosecution to be perjured, thereby causing the court to lose jurisdiction.
 
 
 19
 The judicial fiction of loss of jurisdiction during the course of a proceeding was extended to the federal arena by the landmark decision of Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). There, the Supreme Court found that the trial court "lost" jurisdiction as a result of its failure to provide counsel for the accused. Thus, the Court indicated that collateral review of substantial constitutional deprivations was within the purview of the writ. Finally, in a brief per curiam opinion in Waley v. Johnston, 316 U.S. 101, 104-105, 62 S.Ct. 964, 966, 86 L.Ed. 1302 (1942), the Court deserted this forced jurisdictional construction, holding:
 
 
 20
 [T]he use of the writ in the federal courts to test the constitutional validity of a conviction for crime is not restricted to those cases where the judgment of conviction is void for want of jurisdiction of the trial court to render it. It extends also to those exceptional cases where the conviction has been in disregard of the constitutional rights of the accused, and where the writ is the only effective means of preserving his rights. [Citing Moore and Mooney, supra.]
 
 
 21
 This departure by Waley is crucial because it announced that although there exists no defect in the court's jurisdiction, violations of constitutional rights are nevertheless within the scope of habeas review. The decision becomes significant in the present context because the same statute which vests federal courts with jurisdiction over civilian prisoners also provides for federal jurisdiction where the individual is confined by the military. 28 U.S.C. Sec. 2241(c). Indeed, since the Waley decision, only in Hiatt v. Brown, 339 U.S. 103, 70 S.Ct. 495, 94 L.Ed. 691 (1950), has the Supreme Court indicated that the original view of Siebold and Reed controls, that is, when examining a petition for a writ of habeas corpus the reviewing court will conduct only the narrow inquiry into whether the court had jurisdiction:
 
 
 22
 The single inquiry, the test, is jurisdiction. . . . The correction of any errors [the court-martial] may have committed is for the military authorities which are alone authorized to review its decision.
 
 
 23
 339 U.S. at 111, 70 S.Ct. at 499.
 
 
 24
 Obviously, Waley and Hiatt, although emanating from the same note, struck divergent chords. Harmony, however, was forthcoming from Burns. Although Burns did not parallel the expanding scope of collateral review from civilian courts-noting that "in military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in civilian cases"[10]-the decision clearly modified Hiatt. Indeed, the unswerving statement of Hiatt that military authorities "alone" are authorized to review any errors which may have occurred during a court-martial, was tempered in Burns to require a federal court to determine whether the "military decision has dealt fully and fairly" with the allegations of the petition. 346 U.S. at 142, 73 S.Ct. at 1049.[11] Only Justice Minton, in his concurring opinion, was willing to affirm dismissal of the petition on the basis of Hiatt's narrow jurisdictional test. Thus, this statement of the "fully and fairly" test in Burns represents the military analogue of the maturation of Siebold's "loss of jurisdiction" rationale. See Moore, Mooney, Johnson, and Waley, supra.
 
 
 25
 Moreover, we find much guidance in the specific language of Burns emphasizing "the fair determinations of the military tribunals," and the requirement that the court-martial "has dealt fully and fairly" with the constitutional allegations. Had the Supreme Court intended to deprive the district courts of jurisdiction where the constitutional issue was merely "fully" presented at court-martial, it would not have added "fair" and "fairly" to the test. Rather, the very premise of Burns is that servicemen as well as civilians are constitutionally protected from arbitrary or unlawful treatment.[12]
 
 
 26
 Another approach to federal habeas corpus review of military proceedings is characterized by the law-fact dichotomy articulated most precisely by the Court of Claims: issues of fact are not reviewable; issues of law are. In Shaw v. United States, 357 F.2d 949, 953-954, 174 Ct.Cl. 899 (1966), after announcing a general rule that it would abstain from reviewing court-martial proceedings, the court stated "that such abstinence is not to be practiced where the serviceman presents pure issues of constitutional law, unentangled with an appraisal of a special set of facts. That type of unmixed legal question this court has always decided for itself." It is significant that this law-fact dichotomy comports with the admonition of Burns that it is "not open to a federal civil court to grant the writ simply to re-evaluate the evidence." 346 U.S. at 142, 73 S.Ct. at 1049. Moreover, Burns itself chose to treat the only "legal" issue raised by appellant there: whether the rule of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943), rendered his confession inadmissible. The plurality opinion stated that it did not because McNabb announced a rule of evidence for federal courts, and "its source is not due process of law." 346 U.S. at 145 n. 12, 73 S.Ct. at 1050. Because appellant Levy's attack on Articles 133 and 134 is not dependent upon any evidentiary or factual construction, his argument represents the type contemplated by the traditional Court of Claims' approach.
 
 
 27
 We reject, therefore, the contention that full presentation of the constitutional issues to a court-martial precludes subsequent consideration of those issues by a civilian court. At the very least, where it is unnecessary to "reevaluate the evidence" adduced at the courtmartial because the alleged infirmity is the facial unconstitutionality of the statute under which appellant was charged, a federal court has jurisdiction to inquire whether there existed an infirmity of constitutional dimension in the court-martial proceeding responsible for the detention of the petitioner.II
 
 
 28
 Articles 133 and 134[13] were originally enacted by the Second Continental Congress on June 30, 1775. As enacted in the colonies, these articles derived from the British Articles of War, which, in turn, trace their ancestry from the Articles of War of James II, in 1688. After nearly three hundred years, the incredible similarity between the language of the present articles and their forebears is astonishing. Article 64 of the Articles of War promulgated by James II, provided that "[a]ll other faults, misdemeanours and Disorders not mentioned in these Articles, shall be punished according to the Laws and Customs of War, and discretion of the Court-Martial." Approximately eighty years later, the substance of this provision was incorporated into the British Articles of War of 1765, which were in effect at the beginning of the American Revolution. Article 3 of Section 20 of the British Articles read: "All Crimes not Capital, and all Disorders or Neglects, which Officers and Soldiers may be guilty of, to the Prejudice of good Order and Military Discipline, though not mentioned in the above Articles of War, are to be taken Cognizance of by a Court-martial, and be punished at their Discretion." This article, which was altered ever so slightly by the Second Continental Congress, and enacted as Article 50 of the American Articles of War, remains virtually unchanged today.
 
 
 29
 More of the same is true for Article 133. Originally enacted by the Second Continental Congress as Article 47 of the American Articles of War, the text was identical to Article 23 of Section 15 of the British Articles: "Whatsoever commissioned officer shall be convicted before a general court-martial, of behaving in a scandalous, infamous manner, such as is unbecoming the character of an officer and a gentleman, shall be discharged from the service." As the United States Court of Military Appeals pointed out in United States v. Howe, 17 U.S.C.M.A. 165, 175-76 (1967), the scope of this provision was enlarged when the articles were reenacted in 1806, by omitting the original phrase "scandalous, infamous," and providing simply, "Any commissioned officer convicted before a general court-martial of conduct unbecoming an officer and a gentleman, shall be dismissed the service." Since that time, this article, like Article 134, has remained unchanged.[14]
 
 
 30
 We now embark upon an examination of the constitutionality of these two articles, mindful of Justice Holmes' sage admonition,[15] "[i]f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it."[16]III.
 
 
 31
 Although Article 133 successfully withstood a constitutional attack predicated upon the First Amendment in United States v. Howe, 17 U.S.C.M.A. 165 (1967), we are aware of no decision of the Court of Military Appeals which dealt with that article on the precise issue lodged here: unconstitutionality because of vagueness.
 
 
 32
 Article 134, however, the government informs us, has twice been vindicated in bouts with the vagueness doctrine. United States v. Frantz, 2 U.S.C.M.A. 161 (1953); United States v. Sadinsky, 14 U.S.C.M.A. 563 (1964). In Frantz, the court virtually conceded "the conceivable presence of uncertainty in the first two clauses" of Article 134, but nevertheless experienced such ease in finding the article not void for vagueness that it could state: "[t]o put the question is to answer it in all reasonable minds." 2 U.S.C.M.A. at 163. Indeed, the court even assumed that civilian standards "are applicable in full force to the military community," but reasoned that because the article has been part of our military law since 1775, it must be judged "not in vacuo, but in the context in which the years have placed it. Musser v. Utah, 333 U.S. 95, 97, 68 S.Ct. 397, 398, 92 L.Ed. 562, 565. That the clauses under scrutiny have acquired the core of a settled and understandable content of meaning is clear from the no less than forty-seven different offenses cognizable thereunder explicitly included in the Table of Maximum Punishments of the Manual. . . ." 2 U.S.C.M.A. at 163. The court concluded that Article 134 was of "entirely defensible character," and that it established "a standard 'well enough known to enable those within . . . [its] reach to correctly apply [it].' " See Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926).
 
 
 33
 Besides Frantz, the government would have us accept the constitutionality of Article 134 on the rationale of United States v. Sadinsky, supra. We decline to do so. Prescinding from the fact that Sadinsky did not entertain a challenge to the constitutionality of that article, the decision rests on Frantz and Dynes v. Hoover, 61 U.S. (20 How.) 65, 15 L.Ed. 838 (1858), which we discuss, infra.
 
 
 34
 It is well settled that the statute [Article 134] is not void for vagueness. See United States v. Frantz, 2 USCMA 161, 7 CMR 37, and authorities therein collected. See also Dynes v. Hoover, 20 Howard [61 U.S.] 65 [51 L.Ed. 838] (U.S.1858). Nor does the defense counsel contend otherwise. (Emphasis supplied.)
 
 
 35
 14 U.S.C.M.A. at 565.
 
 
 36
 Thus, it was on the authority of these decisions of the Court of Military Appeals that the district court sustained the constitutionality of these articles. Additionally, the government relies upon "a line of cases dating from 1858 [in which] the Supreme Court has recognized that the . . . Articles . . . are not too vague and are not unconstitutional. Dynes v. Hoover, 61 U.S. (20 How.) 65, 15 L.Ed. 838 (1858); Carter v. McClaughry, 183 U.S. 365 [22 S.Ct. 181, 46 L.Ed. 236] (1902); Grafton v. United States, 206 U.S. 333 [27 S.Ct. 749, 51 L.Ed. 1084] (1907); see also Ex parte Mason, 105 U.S. 696, 698 [26 L.Ed. 1213] (1882)." Because these cases form the basis of the government's argument before this court, we examine them seriatim.
 
 IV.
 
 37
 In Dynes v. Hoover, 61 U.S. (20 How.) 65, 51 L.Ed. 838 (1858), a seaman sought habeas relief after being convicted by a court-martial of attempting to desert. Petitioner contended that there existed no specific military offense of "attempting to desert," and that the court-martial was, therefore, without jurisdiction to try him. The Court rejected this argument, stating that "when offences and crimes are not given in terms or by definition, the want of it may be supplied by a comprehensive enactment, such as the 32d article,[17] of the rules for the government of the navy, which means that courts martial have jurisdiction of such crimes as are not specified, but which have been recognized to be crimes and offences by the usages in the navy of all nations. . . ." 61 U.S. (20 How.) at 82. The Court went on to indicate that such a provision was not subject to abuse despite its "apparent indeterminateness," because it "is well known by practical men in the navy and army, and by those who have studied the law of courts martial," precisely what such crimes are and how they may be punished. Id. It must be conceded, therefore, that Article 134 weathered the challenge of vagueness in the Supreme Court in 1858 for substantially the same reasons adopted by the Court of Military Appeals in 1953 in Frantz.
 
 
 38
 The parade of cases following Dynes approving these "general articles" commenced with the Supreme Court's decision in Smith v. Whitney, 116 U.S. 167, 6 S.Ct. 570, 29 L.Ed. 601 (1886). There the Court dealt with a Navy provision manager and paymaster who falsified and illegally extended various government contracts, "to the great scandal and disgrace of the service, and the injury of the United States." Specifically, the Court held that it was not prepared to "declare that an officer of the navy who, while serving by appointment of the president as chief of a bureau in the navy department, makes contracts or payments, in violation of law, in disregard of the interests of the government, and to promote the interests of contractors, cannot lawfully be tried by a courtmartial composed of naval officers, and by them convicted of scandalous conduct tending to the destruction of good morals, and to the dishonor of the naval service." 166 U.S. at 186, 6 S.Ct. at 580. There, the Court upheld the validity of Articles 8 and 22 of the "Articles for the Government of the Navy." Article 8 provided:
 
 
 39
 Such punishment as a court martial may adjudge may be inflicted on any person in the Navy-
 
 
 40
 First. Who is guilty of profane swearing, falsehood, drunkenness, gambling, fraud, theft, or any other scandalous conduct tending to the destruction of good morals.
 
 
 41
 Article 22, which was Article 32 in Dynes, provided that all offenses committed by Navy personnel, "which are not specified in the foregoing articles, shall be punished as a court martial may direct." This latter article had been interpreted to mean that "when the offense is a disorder or neglect not specifically provided for, it should be charged as 'scandalous conduct tending to the destruction of good morals.' " Orders, Regulations and Instructions for the Administration of Law and Justice in the United States Navy, Sec. 126 (1870). The Court approved the right of the military to so charge, analogizing that the case was similar to "conduct unbecoming an officer and a gentleman," which the Court, in dicta, likewise considered permissible. Unfortunately, however, the opinion contains no searching analysis of such an article's possibility for overbreadth, and, generally speaking, does not constitute a persuasive offering.
 
 
 42
 United States v. Fletcher, 148 U.S. 84, 13 S.Ct. 552, 37 L.Ed. 378 (1893), decided only seven years after Whitney, involved the court-martial of a retired Army captain under Article 83: "Any commissioned officer convicted before a general court martial of conduct unbecoming an officer and a gentleman shall be dismissed the service." Specifically, this charge resulted from Captain Fletcher's incurring and non-payment of certain indebtedness. Before the Supreme Court, appellant argued that the court-martial was without jurisdiction because "the charge and specifications stated no offence whatever 'within any rules and articles of war, or known to the military law and custom of the United States.' " In what can only be characterized as an incredibly conclusory manner, the Court brushed aside this contention, noting only that it could not say "[t]he specifications were . . . incapable of sustaining the charge." 148 U.S. at 92, 13 S.Ct. at 555. Like Whitney, therefore, Fletcher's insight into the validity of these articles hardly rises to the stature of unshakable constitutional dogma.
 
 
 43
 Predictably, however, subsequent decisions found little difficulty in sanctifying the confusing and conclusory treatment offered by Whitney and Fletcher. When it was suggested to the Court in Swaim v. United States, 165 U.S. 553, 17 S.Ct. 448, 41 L.Ed. 823 (1897), that a charge of conduct unbecoming an officer and a gentleman failed to set forth an offense on the facts of that case, the Court merely cited to both Whitney and Fletcher, and added: "If this position were well taken, it would throw upon the civil courts the duty of considering all the evidence adduced before the courtsmartial, and of determining whether the accused was guilty of conduct, to the prejudice of good order and military discipline in violation of the articles of war." 165 U.S. at 561, 17 S.Ct. at 451.
 
 
 44
 There was no contention that the general articles were too vague to support a conviction in Carter v. McClaughry, supra, but rather that charged violations under those articles were contained in previous charges. The opinion of Chief Justice Fuller, therefore, is not illuminating on the issue before us. Nevertheless, the Court found it opportune to refer to Swaim, Whitney and Fletcher, supra, as general support for these articles.[18]
 
 V.
 
 45
 That, then, is the picture. The predominant judicial supports for the proposition that the "general articles" are not void for vagueness consist of Frantz, supra, from the Court of Military Appeals, and Dyne, supra, from the Supreme Court. Notwithstanding these precedents, such as they are, we are persuaded that we are not precluded from reexamining the constitutional question of due process.
 
 
 46
 Initially, we recognize that before us for interpretation is a relatively new Uniform Code of Military Justice, effective January 1, 1957, 10 U. S.C. Sec. 801 et seq. Although, as heretofore observed, the general articles today are basically the same as their historical precedents, they must be construed in conjunction with a comprehensive Military Justice Code of which they are now a component. This code concededly extends to military defendants a broad spectrum of court-martial rights theretofore unaccorded. For example, the new code requires the President to prescribe court-martial procedures which "apply the principles of law and rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter." 10 U.S.C. Sec. 836.
 
 
 47
 We are also conscious of Justice Brennan's observation in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), that "[o]bviously, concepts of justice change," (concurring opinion at 304, 92 S.Ct. 2726), and that, at least insofar as capital punishment is concerned, "the cruel and unusual language 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.' Thus, a penalty that was permissible at one time in our Nation's history is not necessarily permissible today. . . . stare decisis [should] bow to changing values." (Marshall, J., concurring opinion at 329-330, 92 S.Ct. at 2772.)
 
 
 48
 An even more impressive suggestion for the reconsideration of these articles is the specific reference to Article 134 in O'Callahan v. Parker, 395 U.S. 258, 265-266, 89 S.Ct. 1683, 1687, 23 L.Ed.2d 291 (1968), where the Court itself expressed doubts as to the constitutionality of that article:
 
 
 49
 While the Court of Military Appeals takes cognizance of some constitutional rights of the accused who are court-martialed, courts-martial as an institution are singularly inept in dealing with the nice subtleties of constitutional law. Article 134, already quoted, punishes as a crime "all disorders and neglects to the prejudice of good order and discipline in the armed forces." Does this satisfy the standards of vagueness as developed by the civil courts?
 
 
 50
 Such a statement of the issue compels the conclusion that the Supreme Court has invited the federal courts to reexamine this due process question in the context of current constitutional teachings. We turn now to a consideration of those principles.[19]
 
 A.
 
 51
 Initially, we encounter extreme difficulty in reconciling the Court of Military Appeals' "settled and understandable content of meaning" of Article 134, and its "no less than fortyseven different offenses cognizable thereunder,"[20] with the principle that a lack of fair warning in a criminal statute of what conduct is prohibited offends due process. Our examination begins with the basic concept that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. . . . [T]he decisions of the court upholding statutes as sufficiently certain, rested upon the conclusion that they employed words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them, . . . or a well settled common law meaning, notwithstanding an element of degree in the definition as to which estimates might differ." In each such case "a standard of some sort was afforded." Connally v. General Construction Co., 269 U.S. 385, 392, 46 S.Ct. 126, 128, 70 L.Ed. 322 (1927); Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146 (1927).
 
 
 52
 The most recent articulation of the vagueness doctrine, representing a synthesis of past teachings, is found in Grayned v. City of Rockford, 408 U.S. 104, 108-109, 92 S.Ct. 2294, 2299, 33 L. Ed.2d 222 (1972):
 
 
 53
 It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to " 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." (Citations omitted.)[21]
 
 
 54
 Failing to pass constitutional muster have been statutes penalizing "misconduct," Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518, 15 L.Ed.2d 447 (1969); conduct that was "annoying," Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); "reprehensible," Giaccio v. Pennsylvania, supra; and "prejudicial to the best interest" of a city, Gelling v. Texas, 343 U.S. 960, 72 S.Ct. 1002, 96 L.Ed. 1359 (1952). Other federal courts have voided prohibitions of conduct that "reflects discredit," Flynn v. Giarrusso, 321 F.Supp. 1295 (E.D.La.1971); or is "offensive," Oestreich v. Hale, 321 F. Supp. 445 (E.D.Wis.1970).
 
 
 55
 For our purposes then, the following questions must be answered: Do Articles 133 and 134 give to a commissioned officer of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute? Do these articles encourage erratic arrests and convictions?
 
 
 56
 Article 133 fails to explain what conduct "unbecomes" an officer or a gentleman. The Officer's Guide offers little assistance in this direction for it merely advises that "[a]n officer is expected to be a gentleman and a gentleman has been defined as a man who is never intentionally rude."[22] Winthrop, in his classic treatise, Military Law and Precedents, defined "unbecoming" as "morally unbefitting and unworthy," and described a gentleman as a "man of honor . . . of high sense of justice, of an elevated standard of morals and manners, and of a corresponding general deportment."[23] Thus, included within the scope of proscribed conduct under Article 133 is official conduct that "in dishonoring or otherwise disgracing the individual as an officer, seriously compromises his character as a gentleman;" or private conduct that "in dishonoring or disgracing the individual personally as a gentleman, seriously compromises his position as an officer and exhibits him as morally unworthy to remain a member of the honorable profession of arms."[24]
 
 
 57
 Thus, we are far from satisfied that the amorphous phrase, "a gentleman," replete with its capacity for subjective interpretation as set forth in the Manual for Courts-Martial, note 24, supra, can even remotely be said to employ "words or phrases having a technical or other special meaning, well enough known to enable those within their reach to correctly apply them." Connally v. General Construction Co., supra, 269 U.S. at 391, 46 S.Ct. at 127.
 
 
 58
 Article 134 deserves the same criticism. The Manual, relied upon by the court in Frantz, was the subject of extensive reference in the dissenting opinion of Chief Judge Bazelon in Levy v. Corcoran, 128 U.S.App.D.C. 388, 389 F. 2d 929, 932 (1967): "A simple reading of the Articles shows that they are quite broad. Indeed, the Manual for Courts-Martial interprets Article 134 to include more than fifty different offenses ranging from abusing public animals to wearing an unauthorized insignia."[25]
 
 
 59
 Indeed, the history of prosecutions under this article shows that it has served as an unwritten criminal code, a catchall receptacle designed as a statutory basis for prosecutions that run the gamut from impersonating an officer and possession of drugs, to failure to pay debts, gambling with a subordinate, and straggling. Thus, "disorders and neglects to the prejudice of good order and discipline in the armed forces" has provided the statutory authority for prosecutions for drunkenness, appearing in improper uniform, abuse of military vehicles, and possession of marihuana.
 
 
 60
 "Conduct of a nature to bring discredit upon the armed forces" has been interpreted to include any violation of local civil law, adultery, bigamy, fleeing from the scene of an accident, and dishonorable failure to pay debts.
 
 
 61
 "Crimes and offenses not capital" is a veritable criminal code of its own. This cryptic phrase is the statutory justification for "those acts or omissions, not made punishable by another article, which are denounced as noncapital crimes or offenses by enactments of Congress or under authority of Congress and made triable in the Federal civil courts."[26] This includes various assaults, indecent acts with a child under the age of 16 years, false swearing, disloyal statement undermining discipline and loyalty, misprision of a felony, dishonorable failure to pay debts, dishonorable failure to maintain funds for payment of checks, bigamy, communicating a threat, use of false and unauthorized passes, permits, discharge certificates and identification cards, negligent homicide, offense against correctional custody, and receiving stolen property.[27]
 
 
 62
 Indeed, the reasoning in United States v. Frantz, supra, would be more persuasive if the Manual for Courts-Martial, or some other official guide, outlined with exactitude and limitation that conduct proscribed by Article 134. Under such circumstances it might be successfully contended that as part of his military training before embarking upon active duty in the field, a commissioned officer could familiarize himself with the level of behavior required. We might then agree "[t]hat the clauses under scrutiny have acquired the core of a settled and understandable content of meaning." Frantz, supra, 2 U.S.C.M.A. at 163. But Article 134 is open ended. The Manual for Courts-Martial does not purport to list all the offenses cognizable under the article. Thus, the Frantz court, in 1953, noted the existence of "no less than forty-seven different offenses" triable under the article. By 1967, the Court of Appeals for the District of Columbia in Levy v. Corcoran, supra, could extend this count to fifty-eight. 389 F.2d at 933-934. The 1968 Edition of the Manual lists sixty-three illustrative offenses. (Manual, supra, at Appendix 6, paragraphs 126-188). It becomes readily apparent, therefore, that at best the Manual includes but a compilation of those offenses previously determined by various courts-martial to come within the breadth of Article 134. Moreover, such new specifications, detailing conduct that will henceforth be considered criminal, does not cure this defect of overbreadth. "If on its face the challenged provision is repugnant to the due process clause, specification of details of the offense intended to be charged would not serve to validate it. . . . It is the statute, not the accusation under it, that prescribes the rule to govern conduct and warns against transgression . . . . No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State Commands or forbids." Lanzetta v. New Jersey, supra, 306 U.S. at 453, 59 S.Ct. at 619.
 
 
 63
 Several additional observations are prompted by this analysis. There is no one unifying theme to the offenses prohibited by Article 134. Instead, there is a commingling of the military counterpart of civilian offenses against the person, offenses against public morals, and offenses against property. Added to this is a conglomeration of purely military offenses relating to the wearing of a proper uniform and insignia, the carrying of firearms, and the propriety of various relationships with subordinates.
 
 
 64
 The comprehensive sweep of this article, illustrated by the variegated examples contained in the Manual, runs on collision course with the proscription of United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1876): "It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."
 
 
 65
 The National Commission on Reform of Federal Criminal Laws, established by Congress, Public Law 89-801, asserted as its cardinal principle the fundament of American law "that no person can be criminally punished except by judicial process and unless the acts for which he is punished were clearly forbidden prior to the time he committed them."[28] Nor is this "principle of legality" an American monopoly. The French Penal Code, for example, contains the following preamble: "No violation, no misdemeanor, no felony can be punished by punishments not provided by law prior to their commission."[29]
 
 
 66
 Facially, and on the basis of the historical interpretation of Article 134 set forth in the Manual for Courts-Martial, the boundless, open-ended, all-encompassing quality of this article runs counter to the basic philosophy of criminal codes of all modern nations. "The codification of definite rules in the law of crimes is considered by many in Western democratic societies as a fundamental requirement of liberal democracy. 'They take their stand on the principle that no one shall be punished for anything that is not expressly forbidden by law. Nullum crimen, nulla poena, sine lege. They regard that principle as their great charter of liberty.' A. Denning, Freedom Under Law 41 (1949)."[30]
 
 
 67
 In testifying before the Committee on the Judiciary of the United States Senate, Professor Gerhard Mueller, Director of the Criminal Law Education Research Center of New York University, made clear that an examination of all current European codes disclosed that each criminal code contains a "Special Part," describing specific offenses, as well as a "General Part" containing provisions applicable to all substantive offenses.[31] He emphasized: "It has been fundamental throughout this history of Anglo-American Criminal Law, as well as Continental Criminal Law, that criminal liability is imposed on persons who commit a wrongful act knowing that they are doing something wrongful, in other words, acting with 'an awareness of wrongfulness.' "[32]
 
 
 68
 We have previously asked whether Articles 133 and 134 give to a commissioned officer of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute, and whether these articles encourage erratic arrests and convictions. The foregoing analysis now raises a new series of questions.
 
 
 69
 What explicit standard of conduct is announced by a statute which punishes an individual for behaving other than as an officer and a gentleman? In a society witnessing rapidly changing manners and mores, against what existing standard is gentlemanly conduct to be measured?
 
 
 70
 More of the same must be said for Article 134. What specific standard determines what constitutes a disorder or neglect? Can these terms be limited or defined within the seemingly boundless context of Article 134? Even assuming that a meaningful, twentieth-century definition of those terms can be concretized, at what point does such conduct rise to the level at which it prejudices good order and discipline in the armed forces?
 
 
 71
 Under these circumstances, how can we possibly conclude that these articles give individual officers of ordinary intelligence a reasonable opportunity to know what is prohibited? Unlike the Court in Grayned v. City of Rockford, supra, we are unable to find that "it is clear what the [articles] as a whole prohibit[s]." 408 U.S. at 110, 92 S.Ct. at 2300.B.
 
 
 72
 What has already been said is sufficient, in our view, to hold that the General Articles do not pass constitutional muster as measured by contemporary standards of vagueness applicable to statutes and ordinances governing civilians. Without the necessity of a protracted discussion, we conclude that these articles also have the very real capacity for arbitrary and discriminatory enforcement. To reiterate the language of Grayned: "[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." Grayned v. Rockford, supra, 408 U.S. at 108-109, 92 S.Ct. at 2299. "Such vagueness . . . also . . . compels enforcement officers, as well, to guess at what violates the law, thus either setting the stage for arbitrary police action or, if police and prosecutors evolve their own rational standards of enforcement, constituting an inappropriate delegation of criminal lawmaking authority." Scott v. District Attorney, 309 F.Supp. 833, 836 (E.D. La.1970).[33]
 
 
 73
 Transposed to a military setting, the dangers of arbitrary and discriminatory action assume more drastic proportions. The commanding officer may have the option of non-judicial punishment, Article 15, 10 U.S.C. Sec. 815, and named commanding officers have the power to convene general courts-martial, Article 22, 10 U.S.C. Sec. 822, special courts-martial, Article 23, 10 U.S.C. Sec. 823, and summary courts-martial, Article 24, 10 U.S.C. Sec. 824. Moreover, the convening authority has the authority to appoint the members of the court, Article 25, 10 U.S.C. Sec. 825.
 
 
 74
 Our conclusion that Articles 133 and 134 fail to set forth satisfactory standards of conduct leads to the inescapable corollary that enforcement of these articles is to varying degrees arbitrary and discriminatory. Because Article 133 fails to define "conduct unbecoming an officer and a gentleman," are diverse boards of military officers to determine what conduct "becomes" a gentleman? Thus, might what "becomes" an officer in Tokyo, be considered "rude" in Santa Fe, or "unbecoming" at Fort Jackson, South Carolina? Are federal courts to be the arbiters of gentlemanly behavior? Similarly, Article 134 fails to announce any standard by which to determine when conduct becomes "prejudicial to good order and discipline." Who is to determine what conduct is "prejudicial?"
 
 
 75
 Moreover, if we, following an exhaustive search, cannot uncover rational standards by which to judge alleged violations of these articles, how can a commanding officer or court-martial board, with little or no legal training, conceivably legally evaluate alleged transgressions of Articles 133 and 134? Arbitrary and discriminatory enforcement of such vague laws is a fortiori.
 
 C.
 
 76
 Finally, the general articles have the capacity of abutting sensitive areas of basic First Amendment freedoms. Those statutes which regulate conduct touching the borders of this amendment are required to be more specific than others. "It matters not that the words appellee used might have been constitutionally prohibited under a narrowly and precisely drawn statute. At least when statutes regulate or proscribe speech and when 'no readily apparent construction suggests itself as a vehicle for rehabilitating the statutes in a single prosecution,' Dombrowski v. Pfister, 380 U.S. 479, 491 [, 85 S.Ct. 1116, 1123, 14 L.Ed. 2d 22] (1965), the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity,' id., at 486 [, 85 S.Ct. 1116, 1121]; see also Baggett v. Bullitt, 377 U.S. 360, 366 [, 84 S.Ct. 1316, 1319, 12 L.Ed.2d 377] (1964); Coates v. City of Cincinnati, 402 U.S. 611, 616 [, 91 S.Ct. 1686, 1689, 29 L.Ed.2d 214, 1971]; id., at 619-620 [, 91 S.Ct. 1686, 1691] (White, J., dissenting); United States v. Raines, 362 U.S. 17, 21-22 [, 80 S.Ct. 519, 522-523, 4 L.Ed.2d 524] (1960); NAACP v. Button, 371 U.S. 415, 433 [, 83 S.Ct. 328, 338, 9 L.Ed.2d 405] (1963). This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their rights for fear of criminal sanctions provided by a statute susceptible of application to protected expression." Gooding v. Wilson, 405 U. S. 518, 520-521, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408 (1972).
 
 
 77
 Thus, whatever merit there may be in the government's contention that over two hundred years of military operation under these articles have given meaning and certainty to their terms when applied to such ordinary anti-social conduct as indecent assault, the argument becomes unpersuasive where the proscribed conduct is speech arguably protected by the First Amendment.
 
 
 78
 Neither are we unmindful that the Manual for Courts-Martial offers as an example of an offense under Article 134, "praising the enemy, attacking the war aims of the United States, or denouncing our form of government." With the possible exception of the statement that "Special Forces personnel are liars and thieves and killers of peasants and murderers of women and children," it would appear that each statement for which appellant was court-martialed could fall within the example given in the Manual. However, even if this statement in the Manual can be construed as providing a sufficient warning against the conduct of the individual in the case before us, the article nevertheless can be adjudicated void for vagueness if it would be susceptible to future use against conduct not warned against in sufficient detail. As the Court stated in Coates v. City of Cincinnati, supra, 402 U.S. at 616, 91 S.Ct. at 1689: "We need not lament that we do not have before us the details of the conduct found to be annoying. It is the ordinance on its face that sets the standard of conduct and warns against transgression. The details of the offense could no more serve to validate this ordinance than could the details of an offense charged under an ordinance suspending unconditionally the right of assembly and free speech."
 
 
 79
 Although the Supreme Court may have at one time adhered to the doctrine that an individual may not assert the vagueness of a statute unless it is vague as to him, see, e. g., Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774 (1951), that doctrine is no longer in vogue. An individual is now permitted standing to attack an overbroad statute infringing on First Amendment rights even where it may be sufficiently definite as to him and where his own activity may not be protected by the Constitution. Gooding v. Wilson, supra. As the Supreme Court pointed out in the Gooding case, the modern rule is justified by the need to guard against the possible "chilling effect" of an overbroad statute. Id., at 521 of 405 U.S., 92 S.Ct. 1103.
 
 
 80
 Thus, the principle enunciated in Gooding confers standing upon Captain Levy. There is great danger that Articles 133 and 134 will chill protected speech. Moreover, the rule against relying on the constitutional rights of others, see, e. g., Yazoo v. Jackson, 226 U.S. 217, 33 S.Ct. 40, 57 L. Ed. 193 (1912), is discretionary and should not be invoked where it would be difficult for those constitutionally deprived to assert their rights. Barrows v. Jackson, 346 U.S. 249, 255-257, 73 S. Ct. 1031, 97 L.Ed. 1586 (1953).
 
 
 81
 In the instant case, just as the lack of statutorily defined standards led to the conclusion that enforcement of the articles is arbitrary and discriminatory, so too is the conclusion inescapable that such vague articles have an impermissible chilling effect on First Amendment freedoms.
 
 
 82
 We conclude that measured against existing constitutional standards applicable to civilian statutes and ordinances, Articles 133 and 134 are void for vagueness.
 
 
 83
 This does not terminate our inquiry, however, for we are now required to decide whether affirmative countervailing circumstances inhere in the armed forces which justify the existence of statutes which would not otherwise pass constitutional muster.
 
 VI.
 
 84
 We acknowledge that "[m]ilitary law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment." Burns v. Wilson, supra, 346 U.S. at 140, 73 S. Ct. at 1047. Thus, in sustaining the constitutionality of Article 134 against the charge of vagueness, the Court of Military Appeals in Frantz referred to the "presence of special and highly relevant considerations growing out of the essential disciplinary demands of the military service. These are at once so patent and so compelling as to dispense with the necessity for their enumeration -much less their argumentative development." 2 U.S.C.M.A. at 163-64. (Emphasis supplied.) This naked, conclusory statement constitutes a brazen slap at a system whose banner is the protection of individual liberties, and, as such, it has for too long withstood inquiry compelling precise delineation of these "special and highly relevant considerations."
 
 
 85
 It has been suggested that three "special and highly relevant considerations" unique to military life might exist:[34] (1) maintaining high standards of conduct in the armed forces; (2) ease of conviction in a court-martial; and (3) justifying punishment for servicemen who commit unforeseen crimes.
 
 
 86
 The Supreme Court has held that "[i]t is no answer to the constitutional claim [of vagueness of overbreadth] to say . . . that the purpose of these regulations was merely to insure high professional standards and not curtail free expression." NAACP v. Button, supra, 371 U.S. at 438-439, 83 S.Ct. at 341. Moreover, what high standard of conduct is served by convicting an individual of conduct he did not reasonably perceive to be criminal? Is not the essence of high standards in the military, first, knowing one's duty, and secondly, executing it? And, in this regard, would not an even higher standard be served by delineation of the various offenses under Article 134, followed by obedience to these standards?
 
 
 87
 Whatever efficacy there may have been to the ease-of-conviction argument in another era, and we do not assume that it ever was persuasive, the passage and implementation of the Uniform Code of Military Justice clearly demonstrates a Congressional mandate that the maximum of constitutional procedural safeguards now be afforded servicemen. A consideration based on ease-of-conviction is now totally bereft of explicit support and does not deserve the dignity of extended discussion.
 
 
 88
 The third consideration would suggest the desirability of allowing the military freedom to develop a counterpart of common law crimes; to provide statutory authority for the development of new standards of conduct and the imposition of criminal penalties for the violation thereof. Such a notion contravenes our federal tradition. There is no federal common law of crimes today and there never has been,[35] and this principle extends to the military. Whatever has been the tradition of certain states, the enunciation of federal crimes and offenses has always been by statute. Even more fundamental, however, is the "general principle of legality" discussed heretofore, wherein we emphasized the dubious constitutionality of imposing criminal sanctions upon conduct previously not explicitly prohibited by law.
 
 
 89
 Moreover, the Task Force on the Administration of Military Justice in the Armed Forces, in reporting to the Secretary of Defense on November 30, 1972, has flatly denounced the historical basis for Article 134: "The historical reason for having a general article-to try civilian offenses-is no longer valid, as the Uniform Code of Military Justice includes clearly defined civilian-type offenses in its punitive articles. Additionally, concern has been expressed in some quarters that the vagueness and breadth of language in this article makes it overly subject to abuse." Vol. 1, p. 96.
 
 
 90
 Finally, we observe that there exists no military necessity whatsoever for Articles 133 and 134. Punitive Articles 77 through 132, 10 U.S.C. Secs. 877-932, outline substantive offenses with the specificity characteristic of a civilian criminal code. We perceive no justification in not doing likewise for those offenses presently subsumed into Articles 133 and 134.
 
 
 91
 We conclude that there exist no countervailing military considerations which justify the twisting of established standards of due process in order to hold inviolate these articles, so clearly repugnant under current constitutional values.
 
 
 92
 We therefore conclude that Articles 133 and 134 fail to satisfy the standard of precision required by the due process clause and, hence, are void for vagueness.[36] However, in so holding, we also hold that application of this decision shall be prospective only except as to those cases where (1) the issue was raised and preserved and (2) was pending in the military judicial system or pending in the federal court system on this date.[37]
 
 VII.
 
 93
 Having concluded that the charges against Captain Levy under Articles 133 and 134 were unconstitutional, there remains for our consideration the charges brought against appellant under Article 90. Pursuant to this article, appellant was convicted of wilful disobedience of the lawful order of Colonel Henry F. Fancy, a physician who was commanding officer of the United States Army Hospital, Fort Jackson, South Carolina. Appellant refused to obey Colonel Fancy's written and oral order to establish and operate a dermatological training program for Special Forces aidmen. During his court-martial, as well as in his various military and civilian appeals, appellant sought to justify his refusal to obey this direct order on the same two grounds urged on this appeal.
 
 
 94
 First, Levy asserted that to train Special Forces aidmen in dermatology was inconsistent with his concept of medical ethics and violative of the Hippocratic oath because this type of aidman was committing war crimes in Vietnam. Consequently, Levy's act of training these men, he contended, would have constituted participation in a war crime.
 
 
 95
 Refusing to obey an order to commit a war crime is a recognized defense under the Uniform Code of Military Justice to an Article 90 charge. During the trial, the law officer conducted a hearing outside the presence of the members of the court-martial to accept an offer of proof by appellant as to the issue of whether war crimes were being committed in Vietnam and, more specifically, as to whether Special Forces troops as a mode of operation committed war crimes in Vietnam. Upon completion of the hearing, the law officer ruled that although there perhaps occurred instances of needless brutality in the Vietnam War, nevertheless, there was "no evidence that would render this order to train aidmen illegal on the grounds that eventually these men would beome engaged in war crimes or in some other way prostitute their medical training by employing it in crimes against humanity."
 
 
 96
 At best, appellant could establish that individual American personnel may have violated the law of war in Vietnam. However, there never was any showing that the medical training appellant was ordered to give had any connection whatsoever with the perpetration of any war crime. Thus, appellant failed to demonstrate how the existence of war crimes committed by individuals other than those he was ordered to train was relevant to his failure to obey the order. Particularly relevant in this is that he failed to show that Special Forces aidmen as a group engaged systematically in the commission of war crimes by prostituting their medical training.
 
 
 97
 The second and principal thrust of appellant's challenge concerns the lawfulness of the order based upon improper motivation of the superior officer giving the order; this likewise is a recognized defense under the Uniform Code of Military Justice to an Article 90 charge. Appellant contends that Colonel Fancy gave the order knowing it would be disobeyed and that the sole purpose of giving this direct order was to increase the possible punishment which could be imposed on appellant. At trial, the Government introduced significant evidence in its attempt to prove the lawfulness of the order, and defense counsel conducted considerable cross-examination on this point in its attempt to prove the bad motivation behind the order, which would render it unlawful. In his instructions, the law officer instructed the court-martial that they would have to find beyond a reasonable doubt that the order was not given for the sole purpose of increasing punishment for an offense appellant was expected to commit. See, e. g., United States v. Carson, 15 U.S.C.M.A. 407 (1965). Implicit in the court's guilty verdict returned on this charge was a conclusion that the order was not given for the proscribed purpose.
 
 
 98
 In isolation, these factual determinations adverse to appellant under an admittedly valid article are not of constitutional significance and resultantly, are beyond our scope of review. See, Whelchel v. McDonald, 340 U.S. 122, 71 S.Ct. 146, 95 L.Ed. 141 (1950). However, there remains the necessity for determining whether the conviction under the valid Article 90 charge suffered from any constitutional infirmity by reason of its joinder at trial with the charges under Articles 133 and 134, now found to be unconstitutional.
 
 VIII.
 
 99
 We conclude that, under the circumstances here present, joint consideration of the charges under Article 90 with charges under Articles 133 and 134 requires a finding that appellant's right to a fair trial was prejudiced. Because most of the evidence introduced on the charges under Articles 133 and 134 would have been inadmissible under the Article 90 charge, and especially in light of the inflammatory and controversial nature of this evidence, we are persuaded that its consideration was error.
 
 
 100
 In examining the possibility of inherent constitutional infirmities in a second degree murder conviction returned in a state prosecution in which the defendant had been unconstitutionally charged with first degree murder (barred because of double jeopardy), the Second Circuit held that the "question is not whether the accused was actually prejudiced, but whether there is a reasonable possibility that he was prejudiced." United States ex rel. Hetenyi v. Wilkins, 348 F.2d 844, 864 (2d Cir. 1965), cert. denied sub nom., Mancusi v. Hetenyi, 383 U.S. 913, 86 S.Ct. 896, 15 L.Ed.2d 667 (1966). Although the danger that the jury compromised on a lesser charge, as existed in Wilkins, was not present in Captain Levy's court-martial, compromise on a lesser charge is but one way in which a defendant can be prejudiced. Speaking for the court, Judge, now Justice, Marshall said:
 
 
 101
 There could never be any certainty as to whether the jury was actually influenced by the unconstitutionally broad scope of the reprosecution or whether the accused's defense strategy was impaired by this scope of the charge, even if there were a most sensitive examination of the entire trial record and a more suspect and controversial inquest of the jurors still alive and available.
 
 
 102
 348 F.2d at 864.
 
 
 103
 The Supreme Court demands no standard of review less strict nor stringent. Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), dealt with the harmless error statute, 28 U.S.C. Sec. 391 (now 28 U.S.C. Sec. 2111), and did not confront an error of constitutional significance as present in this case. Therefore, a showing of a lesser degree of prejudice may be presented by the appellant here than in Kotteakos, or, conversely, as it is typically stated, the prosecution must demonstrate that the error was harmless beyond a reasonable doubt. Nevertheless, Kotteakos did hold that neither a clear showing in the record of the accused's guilt nor findings of not guilty as to some defendants which indicated that the jury did discriminate among the charges, was sufficient to overcome the prejudice to the defendants from an overly broad charge. 328 U.S. at 767, 66 S.Ct. 1239.
 
 
 104
 We find, with some facility, that Levy was prejudiced by the admission of evidence on the Articles 133 and 134 charges; in any event, there undoubtedly existed a reasonable possibility that he was prejudiced. A number of factors support this conclusion.
 
 
 105
 First, it is not the role of this court to weigh the evidence to determine whether Levy was or was not guilty of the Article 90 charge. Our sole responsibility is to decide whether there exists a reasonable possibility that the courtmartial's finding of guilt on the Article 90 charge was influenced by evidence admitted on the Articles 133 and 134 charges. The question of the legality of the Article 90 order was contested at trial. We cannot be certain whether the court-martial's resolution of that question was affected by evidence of Levy's anti-war sentiments.
 
 
 106
 Second, the court-martial found under the Articles 133 and 134 charges that Levy did not write the letter to Sergeant Hancock, supra, at 777, "with intent to interfere with . . . loyalty, morale" etc., although he did write it with "culpable negligence" as to its impact. Such a finding indicates the jury did follow the judge's instructions on lesser included offenses. Nevertheless, it does not reasonably follow from this that the jury separated its consideration of the Article 90 charge from the evidence introduced in connection with the other charges. Kotteakos, supra.
 
 
 107
 Third, it is true that many of Levy's political views were elicited by the defense in its cross-examination of Colonel Fancy. This trial strategy was designed to demonstrate an illegal motive on Fancy's part. It is by no means clear, however, that Levy's political views would have been emphasized in the absence of the Articles 133 and 134 charges. Indeed, Levy's attorneys believed he would be prejudiced by a joint trial of all charges. They moved for a severance. Had the severance been granted it is quite possible the defense would have relied only on the claims that the order commanded Levy to commit a war crime (tried out of the hearing of the jury), and that compliance with the order would have violated medical ethics. We do not know how the court-martial would have progressed, nor can we speculate how the defense would have been conducted.
 
 
 108
 In sum, we can only speculate what would have happened at Captain Levy's court-martial had he been charged only with a violation of Article 90. Under such circumstances, we cannot reach the legal conclusion that Captain Levy was not prejudiced by having the court told explicitly that he had called Special Forces personnel "killers of peasants," and "murderers of women and children," had told enlisted men "they should refuse to go to Vietnam," and had written, "Is Communism worse than a U.S. oriented government? . . . I doubt it." We are unable to reconstruct by hindsight on the basis of reasonable predictability of human behavior, a jurisprudential setting in which a fact-finding panel of military officers could have been immunized, in theory or in fact, from the inflammatory effect of such statements derogating the very military apparatus which the factfinders were sworn to defend and protect.
 
 
 109
 This being so, we turn to the teachings of Kotteakos, supra: "But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S. at 765, 66 S.Ct. at 1248. We are left in grave doubt.
 
 
 110
 The judgment of the district court will be reversed and the cause remanded for the purpose of issuing the writ of habeas corpus unless within ninety days of the date hereof the appropriate military authorities shall grant to Howard B. Levy a new trial on the Article 90 charge.
 
 APPENDIX
 213. ARTICLE 134-GENERAL ARTICLE
 
 111
 a. General
 
 
 112
 Discussion. Article 134 makes punishable all acts not specifically proscribed in any other article of the code when they amount to disorders or neglects to the prejudice of good order and discipline in the armed forces or to conduct of a nature to bring discredit upon the armed forces, or constitute noncapital crimes or offenses denounced by enactment of Congress or under authority of Congress. If conduct of this nature is specifically made punishable by another article, it should be charged as a violation of that article; and if it is not specifically made punishable by another article, it should be charged as a violation of Article 134. But see 212. The specification alleging a violation of Article 134 need not expressly allege that the conduct was a disorder or neglect, or that it was of a nature to bring discredit upon the armed forces, or that it constituted a crime or offense not capital. Under a specification alleging a violation of Article 134, a finding of guilty may properly be returned if the courtmartial is convinced beyond a reasonable doubt that the acts of the accused constituted a disorder or neglect to the prejudice of good order and discipline in the armed forces, that his conduct was of a nature to bring discredit upon the armed forces, or that his conduct violated an applicable statute enacted by or under authority of Congress. The same conduct may constitute a disorder or neglect to the prejudice of good order and discipline in the armed forces and at the same time be of a nature to bring discredit upon the armed forces. Although evidence presented at the trial of an offense alleged under Article 134 may be insufficient to establish the commission of a crime or offense not capital, it may nevertheless be sufficient to establish a disorder or neglect to the prejudice of good order and discipline or service-discrediting conduct and thus support a conviction. See 213d.
 
 
 113
 b. Disorders and Neglects to the Prejudice of Good Order and
 
 Discipline in the Armed Forces
 
 114
 Discussion. The disorders and neglects punishable under this clause of Article 134 include those acts or omissions to the prejudice of good order and discipline not specifically mentioned in other articles.
 
 
 115
 "To the prejudice of good order and discipline" refers only to acts directly prejudicial to good order and discipline and not to acts which are prejudicial only in a remote or indirect sense. Almost any irregular or improper act on the part of a member of the military service could be regarded as prejudicial in some indirect or remote sense; however, the article does not contemplate these distant effects. It is confined to cases in which the prejudice is reasonably direct and palpable.
 
 
 116
 Instances of prejudicial disorders and neglects in the case of an officer are rendering himself unfit for duty by excessive use of intoxicants or drugs; drunkenness; and allowing a member of his command to go on duty knowing him to be drunk.
 
 
 117
 Instances of prejudicial disorders and neglects in the case of enlisted persons are appearing in improper uniform; wrongfully abusive use of military vehicles; careless discharge of firearms; and impersonating an officer.
 
 
 118
 A breach of a custom of the service may result in a violation of this clause of Article 134. In its legal sense the word "custom" imports something more than a method of procedure or a mode of conduct or behavior which is merely of frequent or usual occurrence. Custom arises out of long established practices which by common consent have attained the force of law in the military or other community affected by them. There can be no such thing as a custom that is contrary to existing law or regulation. A custom which has not been adopted by existing statute or regulation ceases to exist when its observance has been long abandoned. Many customs of the service are now set forth in regulations of the various armed forces. Violations of these customs should be charged under Article 92 as violations of the regulations in which they appear.
 
 
 119
 It is a violation of this article wrongfully to possess or use marihuana or a habit forming narcotic drug. Possession or use of marihuana or a habit forming narcotic drug may be inferred to be wrongful unless the contrary appears. A person's possession or use of a drug is innocent when the drug has been duly prescribed for him by a physician and the prescription has not been obtained by fraud, when he possesses it in the performance of his duty, or when his possession or use of marihuana or a narcotic drug is without knowledge of the presence or the nature of the substance (see 154a(4)). If an issue is raised by the evidence as to whether possession or use by an accused charged with this offense was innocent on one of these grounds, a showing that it was not innocent on that ground becomes a requirement of proof.
 
 
 120
 c. Conduct of a Nature to Bring Discredit Upon the Armed
 
 Forces
 
 121
 Discussion. "Discredit" as here used means "to injure the reputation of." This clause of Article 134 makes Punishable conduct which has a tendency to bring the service into disrepute or which tends to lower it in public esteem. Any discreditable conduct not denounced by a specific article of the code is punishable under this clause. Acts in violation of local civil law may be punished if they are of a nature to bring discredit upon the armed forces. Included within the conduct which may be found to be within the proscription of this clause are adultery, bigamy, negligent homicide, fleeing the scene of an accident, indecent acts, and dishonorable failure to pay debts.
 
 
 122
 d. General Requirements of Proof Under Article 134
 
 
 123
 The proof required for conviction of an offense under Article 134 depends upon the nature of the misconduct charged. If the conduct is punished as a crime or offense not capital (213e), the proof must establish every element of the crime or offense as required by the applicable law. One element of proof common to every case tried under Article 134, except one tried as a crime or offense not capital, is that the conduct of the accused, under the circumstances, was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. This element is common to all the offenses discussed in 213f and should be included in instructions as to the elements of these offenses, in addition to their specific elements. Subject to the foregoing, an offense under either of the first two clauses of Article 134 requires the following proof:
 
 
 124
 (1) That the accused did or failed to do the acts, as alleged; and
 
 
 125
 (2) That under the circumstances his conduct was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 126
 e. Crimes and Offenses not Capital
 
 
 127
 Crimes and offenses not capital which are referred to and made punishable by Article 134 include those acts or omissions, not made punishable by another article, which are denounced as noncapital crimes or offenses by enactments of Congress or under authority of Congress and made triable in the Federal civil courts.
 
 
 128
 State and foreign laws are not included within the crimes and offenses not capital referred to in Article 134 and violations thereof may not be prosecuted as such except insofar as State law becomes Federal law of local application under section 13 of title 18 of the United States Code. On the other hand, an act which is a violation of a State law or a foreign law may constitute a disorder or neglect to the prejudice of good order and discipline or conduct of a nature to bring discredit upon the armed forces and so be punishable under the first or second clause of Article 134.
 
 
 129
 For the purpose of court-martial jurisdiction, the laws which may be applied under the clause, "crimes and offenses not capital," are divided into two groups:
 
 
 130
 (1) Crimes and offenses of unlimited application. Certain noncapital crimes and offenses denounced by the United States Code, such as counterfeiting (18 U.S.C. Sec. 471), various frauds against the Government not denounced by Article 132, and other offenses which are directly injurious to the Government and are made punishable wherever committed are made applicable under the third clause of Article 134 to all persons subject to the code regardless of where the wrongful act or omission occurred. The Narcotic Drugs Import and Export Act (21 U.S.C. Secs. 171-185) falls within this group, being applicable to the importation of proscribed drugs not only into areas over which the United States is sovereign but also into territories subject to the control of the United States for a special purpose, including military installations on foreign soil.(2) Crimes and offenses of local application. Those noncapital crimes and offenses which are listed in the United States Code but which are limited in their applicability to the special maritime and territorial jurisdiction of the United States as defined in the United States Code, those applicable within the continental United States, and those included in the law of the District of Columbia, in the law of a Commonwealth, Territory or possession of the United States, and in the laws applicable in reservations or places over which the United States has exclusive jurisdiction or concurrent jurisdiction with a State, which are not specifically included in another article of the code, are made applicable under Article 134 to all persons subject to the code who commit these crimes or offenses within the geographical boundaries of the areas in which they are applicable. For the law applicable in a reservation or a place over which the United States has exclusive jurisdiction or concurrent jurisdiction with a State, see 18 U.S.C. Sec. 13. A person subject to the code cannot be prosecuted under the third clause of Article 134 for having committed a crime or offense, not capital, if the act occurred in a place where the law in question did not apply. For example, a person cannot be prosecuted under the third clause of Article 134 for having committed a crime or offense, not capital, when the act occurred in occupied foreign territory merely because that act would have been an offense against the law of the District of Columbia if it had been committed there. Such an act might, however, regardless of where committed, in a proper case be prosecuted under the first or second clause of Article 134 as a disorder or neglect to the prejudice of good order and discipline or as an offense of a nature to bring discredit upon the armed forces.
 
 
 131
 f. Various Types of Offenses Under Article 134
 
 
 132
 (1) Assaults Involving Intent to Commit Certain Offenses of a Civil Nature
 
 
 133
 Discussion. See 207 (Assault). The assaults here designated as being punishable under Article 134 are those perpetrated with intent to commit murder, voluntary manslaughter, rape, robbery, sodomy, arson, burglary, or housebreaking. An assault with intent to commit an offense is not necessarily the equivalent of an attempt to commit the intended offense, for an assault can be committed with intent to commit an offense without achieving that degree of proximity to consummation of an intended offense which is essential to an attempt. See 159.
 
 
 134
 Some of these assaults will be discussed below.
 
 
 135
 (a) Assault with intent to murder. This is an assault committed with a specific intent to kill, under such circumstances that, if death resulted therefrom, the offense of murder would have been committed. To constitute an assault with intent to murder with a firearm, it is not necessary that the weapon be discharged; and in no case is the actual infliction of injury necessary. Thus, if a man with intent to murder another deliberately assaults him by shooting at him, the fact that he misses does not alter the character of the offense. When the intent to murder exists, the fact that for some unknown reason the actual consummation of the murder by the means employed is impossible is not a defense if the means are apparently adapted to the end in view. Thus, if a person intending to murder another loads his rifle with what he believes to be a live cartridge and aims and discharges his rifle at the other, it is no defense that, by accident, he used a dummy cartridge.
 
 
 136
 The intent to murder need not be directed against the person assaulted if the assault is committed with intent to murder some person. If the accused, intending to murder A, shoots at B, mistaking him for A, he is guilty of assaulting B with intent to murder him. Also, if a man fires into a group with intent to murder someone, he is guilty of an assault with intent to murder each member of the group.
 
 
 137
 (b) Assault with intent to commit voluntary manslaughter. This is an assault committed with a specific intent to kill under such circumstances that, if death resulted therefrom, the offense of voluntary manslaughter would have been committed. There can be no assault with intent to commit involuntary manslaughter, for involuntary manslaughter is not a crime capable of being intentionally committed.
 
 
 138
 (c) Assault with intent to commit rape. This is an assault committed by a man with a specific intent to have sexual intercourse with a woman not his wife by force and without her consent. The accused must have intended to overcome any resistance by force, actual or constructive, and to penetrate the woman's person. Any lesser intent will not suffice. Indecent advances and importunities, however earnest, not accompanied by such an intent, do not constitute this offense, nor do mere preparations to rape not amounting to an assault. Thus, if a man, intending to rape a woman, conceals himself in her room to await a favorable opportunity to execute his design, but before the opportunity arises is discovered and flees, he is not guilty of an assault with intent to commit rape.
 
 
 139
 No actual touching is necessary. If a man enters a woman's room and gets in the bed where she is for the purpose of raping her, he commits the offense under discussion although he does not touch the woman.
 
 
 140
 Once an assault with intent to commit rape is made, it is no defense that the man voluntarily desisted.
 
 
 141
 Lesser offenses that may be included in a charge of assault with intent to rape are indecent assault and assault.
 
 
 142
 (d) Assault with intent to rob. This is an assault committed with a specific intent to steal property by taking it from the person or in the presence of another, against his will, by means of force or violence or putting him in fear. The fact that the accused intended to take only money and that the person he intended to rob had none is not a defense.
 
 
 143
 (e) Assault with intent to commit sodomy. The assault must be against a human being and must be committed with a specific intent to commit sodomy. Any lesser intent, or different intent, will not suffice.
 
 
 144
 Proof. (a) That the accused assaulted a certain person, as alleged; (b) that the accused at the time of the assault had a specific intent to kill, as required for murder or voluntary manslaughter, or to commit rape, robbery, sodomy, arson, burglary, or housebreaking, as alleged; and (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 145
 (2) Indecent Assault
 
 
 146
 Discussion. See 207 (Assault). An indecent assault is the taking by a man of indecent, lewd, or lascivious liberties with the person of a female not his wife without her consent and against her will, with intent to gratify his lust or sexual desires. In a proper case indecent assault may be an included offense of assault with intent to commit rape.
 
 
 147
 Proof. (a) That the accused assaulted a certain female not his wife by taking indecent, lewd, or lascivious liberties with her person; (b) that the acts were done with intent to gratify the lust or sexual desires of the accused; and (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.(3) Indecent Acts With a Child Under the Age of 16 Years
 
 
 148
 Discussion. This offense consists of taking any immoral, improper or indecent liberties with, or the commission of any lewd or lascivious act upon or with the body of any child of either sex under the age of 16 years with the specific intent of arousing, appealing to, or gratifying the lust or passions or sexual desires, either of the person committing the act, or of the child, or of both. When the accused is charged with taking indecent liberties, the liberties must be taken in the physical presence of the child, but it is not essential that the evidence show physical contact between the accused and the child. Thus, one who with the requisite intent exposes his private parts to a child under the age of sixteen years may be found guilty of this offense. Nonconsent by the child to the act or conduct is not essential to this offense, nor is consent a defense.
 
 
 149
 Proof. (a) That the accused took certain immoral, improper or indecent liberties with a certain child, as alleged; or that he performed a certain lewd or lascivious act upon or with the body of a certain child, as alleged; (b) that the child was under the age of 16 years, as alleged; (c) that the intent of the accused was to arouse, appeal to, or gratify the lust or passions or sexual desires of the accused or the child or both, as alleged; and (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 150
 (4) False Swearing
 
 
 151
 Discussion. False swearing is the making under lawful oath, not in a judicial proceeding or course of justice, of any false statement, oral or written, not believing the statement to be true. It may consist, for example, in making a false oath to an affidavit. The oath may be taken before any person authorized by law to administer oaths. See Article 136 and chapter XXII as to the authority of certain persons to administer oaths, and see 147a as to taking judicial notice of the signatures of persons authorized to administer oaths. An oath includes an affirmation when the latter is authorized in lieu of an oath.
 
 
 152
 The principles set forth in the last two paragraphs of the discussion of perjury in 210 apply also to false swearing.
 
 
 153
 Proof. (a) That the accused took an oath or its equivalent, as alleged; (b) that the oath was administered to the accused in a matter in which an oath was required or authorized by law; (c) that the oath was administered by a person having authority to do so; (d) that upon this oath the accused made or subscribed a certain statement, as alleged; (e) that the statement was false; (f) that the accused did not believe the statement to be true; and (g) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 154
 (5) Disloyal Statement Undermining Discipline and Loyalty
 
 
 155
 Discussion. Certain disloyal statements by military personnel may lack the necessary elements to constitute an offense under 18 U.S.C. Secs. 2385, 2387, and 2388, but nevertheless, under the circumstances, be punishable as conduct to the prejudice of good order and discipline or conduct reflecting discredit upon the armed forces. Examples are utterances designed to promote disloyalty or disaffection among troops, as praising the enemy, attacking the war aims of the United States, or denouncing our form of government.
 
 
 156
 Proof. (a) That the accused made the disloyal statement, as alleged; (b) that the accused at the time of making the statement did so with the design alleged; and (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 157
 (6) Misprision of a Felony
 
 
 158
 Discussion. A person who has knowledge of the actual commission of a felony by another and who conceals and does not as soon as possible make known the same to the civil or military authorities is guilty of misprision of the felony. Any offense of a civil nature punishable under the authority of the code by death or by confinement for a term exceeding one year is a felony. A mere failure or refusal to disclose the felony without some positive act of concealment does not make one guilty of this offense. Making a false entry in an account book for the purpose of concealing a felonious theft committed by another, and intimidating a witness of a felony, are examples of a positive act of concealment.
 
 
 159
 Proof. (a) That the accused had knowledge of the actual commission of a felony by another; (b) that he concealed and did not as soon as possible make known the felony to the civil or military authorities; and (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 160
 (7) Dishonorable Failure to Pay Debts
 
 
 161
 Discussion. A dishonorable failure to pay a just debt under circumstances which bring or tend to bring discredit upon the armed forces or which are prejudicial to good order and discipline in the armed forces is an offense under this article. More than mere negligence in the nonpayment is necessary. The failure to pay must be characterized by deceit, evasion, false promises, or other distinctly culpable circumstances indicating a deliberate nonpayment or grossly indifferent attitude toward one's just obligations.
 
 
 162
 For a debt to form the basis for this offense, the accused must not have had a defense, or an equivalent offset or counterclaim, either in fact or according to his belief at the time alleged. The offense should not be charged if there was a genuine dispute between the parties as to the facts or law relating to the debt which would affect the obligation of the accused to pay. The offense is not committed if the creditor or creditors involved are satisfied with the conduct of the debtor with respect to payment.
 
 
 163
 The length of the period of nonpayment and any denial of his indebtedness which the accused may have made may tend to prove that his conduct was dishonorable, but the court-martial may convict only if it finds from all of the evidence that his conduct was in fact dishonorable.
 
 
 164
 A commissioned officer may be tried for this offense under either Article 133 or Article 134, as the circumstances may warrant.
 
 
 165
 Proof. (a) That the accused was indebted to a certain person or entity in a certain sum, as alleged; (b) that the debt became due and payable on or about a certain date, as alleged; (c) that at the time alleged while the debt was still due and payable, the accused dishonorably failed to pay the debt; and (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 166
 (8) Dishonorable Failure to Maintain Funds for Payment of
 
 Checks
 
 167
 Discussion. One who, having made and uttered a check, thereafter dishonorably fails to maintain sufficient funds in or credit with the drawee bank for its payment upon presentment, is chargeable under this article. This offense differs from the offense denounced by Article 123a in that there need be no intent to defraud or deceive at the time of making, drawing, uttering or delivery, and that the accused need not know at that time that he did not or would not have sufficient funds for payment. The gist of the offense lies in the conduct of the accused after uttering the instrument.
 
 
 168
 Mere negligence in maintaining one's bank balance is insufficient as a basis for this offense, and the accused's conduct must reflect bad faith or gross indifference in this regard. As in 213f(7), dishonorable conduct of the accused is necessary, and the other principles discussed in 213f(7) likewise apply.
 
 
 169
 Proof. (a) That the accused made and uttered a certain check, as alleged; (b) that thereafter the accused dishonorably failed to maintain funds in or credit with the drawee bank for payment of the check upon its presentment for payment in due course; and (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 170
 (9) Bigamy
 
 
 171
 Discussion. Bigamy is the contracting of another marriage by one who already has a lawful spouse living. If a prior marriage was void, it will have created no status of "lawful spouse." However, if it was merely voidable and has not been voided by competent court action, this circumstance is no defense. A belief that a prior marriage has been terminated by divorce, death of the other spouse, or otherwise, constitutes a defense only if the belief was reasonable (154a(4)).
 
 
 172
 Proof. (a) That, at the time and place alleged, the accused married a certain person, as alleged; (b) that, at the time of this marriage there existed a prior valid marriage entered into by the accused with another person, as alleged, which prior marriage was then undissolved; and (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 173
 (10) Communicating a Threat
 
 
 174
 Discussion. This offense consists of wrongfully communicating an avowed present determination or intent to injure the person, property, or reputation of another presently or in the future. The communication may be made to the person threatened or to another. To establish the threat it is necessary to show that the declaration in question was made. It is not necessary, however, that the accused actually entertained the intention stated in the declaration. However, a declaration made under circumstances which reveal it to be in jest or for an innocent or legitimate purpose, or which contradict the expressed intent to commit the act, does not constitute this offense. Nor is the offense committed by the mere statement of intent to commit an unlawful act not involving injury to another.
 
 
 175
 Proof. (a) That the accused communicated certain language expressing a present determination or intent wrongfully to injure another person, as alleged, presently or in the future; (b) that the communication was made known to that person or to a third person, as alleged; (c) that the communication was wrongful and without justification or excuse; and (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 176
 (11) False and Unauthorized Passes, Permits, Discharge
 
 Certificates, and Identification Cards
 
 177
 Discussion. Certain acts with respect to military or official passes, permits, discharge certificates, or identification cards may be punishable under this article. The wrongful use, possession, sale, or other disposition of a false or unauthorized pass, permit, discharge certificate, or identification card with knowledge that it was false or unauthorized may be charged under this article. Although it is not necessary that the use, possession, sale, or disposition of the document be with an intent to deceive or defraud, the use or possession of a false or unauthorized document with such an intent is an aggravating circumstance authorizing more severe punishment. See 127c. See also 202A for a definition of intent to deceive and intent to defraud. The false making or altering of a military or official pass, permit, discharge certificate, or identification card may also be charged under this article. As to this offense, there is no requirement of knowledge or of an intent to deceive or defraud. The phrase "military or official pass, permit, discharge certificate, or identification card" includes, as well as the more usual forms of these documents, all documents issued by any governmental agency for the purpose of identification and copies and facsimiles thereof.
 
 
 178
 Proof. Wrongful use or possession of a false or unauthorized pass, permit, discharge certificate, or identification card. (a) That the accused wrongfully used or had in his possession a certain military or unauthorized as alleged; (c) that the icate, or identification card, as alleged; (b) that the pass, permit, discharge certificate, or identification card was false or unauthorized as alleged; (c) that the accused knew that the pass, permit, discharge certificate, or identification card was false or unauthorized, as alleged; (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces; and, if alleged, (e) that the use or possession was with intent to deceive or defraud.
 
 
 179
 Wrongful sale or disposition of a pass, permit, discharge certificate or identification card. (a) That the accused wrongfully sold or disposed of a certain military or official pass, permit, discharge certificate, or identification card, as alleged; (b) that the pass, permit, discharge certificate, or identification card was false or unauthorized, as alleged; (c) that the accused knew that the pass, permit, discharge certificate, or identification card was false or unauthorized, as alleged; and (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 180
 Falsely making or altering a pass, permit, discharge certificate, or identification card. (a) That the accused wrongfully and falsely made or altered a certain military or official pass, permit, discharge certificate, or identification card, as alleged; and (b) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 181
 (12) Negligent Homicide
 
 
 182
 Discussion. Negligent homicide is any unlawful homicide which is the result of simple negligence. Simple negligence is a lesser degree of carelessness than culpable negligence. See 198b. It is the absence of due care, that is, an act or omission of a person who is under a duty to use due care which exhibits a lack of that degree of care for the safety of others which a reasonably prudent man would have exercised under the same or similar circumstances.
 
 
 183
 Proof. (a) That the person named or described is dead; (b) that his death was unlawfully caused by the acts or omissions of the accused, as alleged; (c) that the acts or omissions of the accused constituted negligence; and (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 184
 (13) Offenses Against Correctional Custody
 
 
 185
 Discussion. Escape from correctional custody is the act of a person undergoing the punishment of correctional custody pursuant to Article 15(131c(4) ) who, before being set at liberty by proper authority, casts off any physical restraint imposed by his custodian or by the place or conditions of custody. Breach of restraint during correctional custody is the act of a person undergoing the punishment who, in the absence of physical restraint imposed by a custodian or by the place or conditions of custody, breaches any form of restraint imposed during this period. See 57b as to the manner of determining the legality of the imposition of correctional custody.
 
 
 186
 Proof. Escape from correctional custody. (a) That the accused was duly placed in correctional custody; (b) that, at the time and place alleged, the accused freed himself from the physical restraint of his correctional custody, as alleged, before having been released therefrom by proper authority; and (c) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 187
 Breach of correctional custody (a) That the accused was duly placed in correctional custody; (b) that while in such correctional custody, a certain restraint was imposed upon the accused; (c) that, at the time and place alleged, the accused broke this restraint, before having been released from the correctional custody or relieved of the restraint by proper authority; and (d) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 188
 (14) Receiving Stolen Property
 
 
 189
 Discussion. "Receiving stolen property" is the receiving, buying, or concealing of any article or thing of value, the property of another person, with knowledge that the article or thing has been stolen.
 
 
 190
 While an actual thief is not criminally liable for receiving the property he has stolen, one who may be criminally responsible as a principal to the larceny, when not the actual thief (156), can be convicted of knowingly receiving the stolen property under Article 134. Thus, if A procures B to steal several items, agreeing to pay him a certain price for them, and B subsequently steals them and delivers them to A, A can be found guilty of knowingly receiving stolen property despite the fact that his conduct would make him guilty of larceny as a principal.
 
 
 191
 Proof. (a) That the accused received, bought or concealed certain property of a value alleged; (b) that the property belonged to another person named or described; (c) that the property had been stolen; (d) that the accused then knew that the property had been stolen; and (e) that, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces.
 
 
 192
 SEITZ, Chief Judge (concurring in part and dissenting in part).
 
 
 193
 While I agree with the well-reasoned opinion of the majority finding Articles 133 and 134 unconstitutionally vague, I cannot join in the majority's ultimate disposition of the case. I believe that despite the joinder of the Article 90 charge with the Articles 133 and 134 charges, there was no substantial prejudice to Captain Levy's constitutional right to a fair trial on the Article 90 charge.
 
 
 194
 As pointed out in the majority opinion, Captain Levy defended against the Article 90 charge on three counts: (1) the order was illegal because primarily motivated by a desire to increase punishment-a defense cognizable under the Uniform Code of Military Justice;[1] (2) the order was illegal because it ordered the defendant to commit a war crime-a defense likewise cognizable under the UCMJ; and (3) the order was illegal because it forced the defendant to violate his medical ethics-a defense not recognized under the UCMJ. It is to be noted that it was never contended by Captain Levy that he did in fact obey the order.
 
 
 195
 As a matter of law, only (1) and (2) were sustainable defenses, and only (1) was submitted to the court-martial. Point (2) was tried outside the hearing of the court-martial and only before the law officer because it involved an initial determination of law. Since that determination was made adversely to defendant by the law officer, it was never submitted to the court-martial for its consideration. Point (3) was ruled not to be a legal defense, and the law officer instructed the jury that even if they found such a conflict, they would not be entitled to acquit Captain Levy on that basis.
 
 
 196
 Against this background, this court's inquiry should be two-fold: (A) whether evidence introduced on the two unconstitutional charges substantially prejudiced Captain Levy's constitutional right to a fair trial on the Article 90 charge; and (B) whether the presumption of validity attaching to a general sentence is rebutted by direct evidence on this record, where there was joint consideration of the Article 90 charge with the other two unconstitutional convictions for sentencing purposes.
 
 
 197
 A. The first inquiry necessarily must be whether the evidence on the unconstitutional charges prejudiced defendant's right to a fair trial on the Article 90 charge in derogation of his right to Fifth Amendment Due Process. However, because of the peculiarities of a court-martial proceeding, the applicable standard of review is by no means clear.
 
 
 198
 There are two elements not present in normal civilian proceedings which complicate our task on review in determining whether or not there was sufficient prejudice to warrant reversal. The first is that, as here, there can be joinder in one trial of offense which have neither a common legal nor a common factual basis. Thus, Captain Levy was tried in one proceeding for violations of one set of Articles-133 and 134-which had common legal elements and could be proven by the introduction of similar evidence, and for violation of another Article-90-which involved completely separate legal elements and required totally different evidence for conviction. Federal rules of procedure would prohibit such a joinder in a federal civilian proceeding. Fed.R.Crim.P. 8. Thus, federal civilian courts would rarely, if ever, be faced with reviewing the type of situation with which we are here confronted.
 
 
 199
 The second element peculiar to the military judicial system is that a defendant can take the stand and limit testimony to any one charge, or any number of charges less than the whole, of his own choosing. This would seem to be a compensating factor for the military policy to join all serious offenses against a defendant into one trial, discussed above. Manual for Courts-Martial p p 30h, 33f (1951). For example, in the instant case, Captain Levy could have taken the stand solely to defend against the Article 90 charge without subjecting himself to examination on the Articles 133 and 134 charges. Thus, taking the witness stand in a court-martial proceeding does not operate as a complete waiver of one's Fifth Amendment right against self-incrimination. Instead, it operates as a waiver only as to those charges specified by the defendant.
 
 
 200
 Because of these peculiarities extant only in the military system, and the resultant lack of actual similarity to seemingly analogous situations in civilian proceedings, the cases relied upon by the majority are not particularly enlightening. One line of cases involves introduction of unconstitutionally seized evidence probative of guilt on the offense charged. The second line of cases involves joined charges where incriminating evidence is introduced on one count which is subsequently determined unconstitutionally tainted, and that evidence overlaps as to elements of proof on the otherwise valid charge. However, none of these cases involve the type of situation present here where there is no overlap of probative evidence because of the joinder of distinct charges involving distinct and different legal and factual elements of proof.
 
 
 201
 The standard of review applied here by the majority-"reasonable possibility of prejudice"-was enunciated by the Supreme Court in Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963). Examination of that case only illustrates the differences confronting the Court there and that confronting the court here. In Fahy, the unconstitutional element was the introduction into evidence of a can of black paint which had been seized in violation of the Fourth Amendment. Defendant was charged with painting swastikas on synagogues. Therefore, the illegally seized evidence tended to show participation in the criminal conduct charged. Necessarily, careful scrutiny was called for, since the tainted evidence directly reflected on an inference of guilt. Development of this standard of close scrutiny, in fact, can be traced to the highly analogous situation involving introduction at trial of a coerced confession. However, those factual and legal situations are not analogous to the operative facts of the trial and evidence introduced in the instant case.
 
 
 202
 In Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), we have an example of the second type of cases, involving a joinder of charges. There, the defendant had been tried on two related charges: burglary and larceny. The Court held the larceny conviction had been obtained in violation of defendant's constitutional right against double jeopardy. Because it was a direct appeal, the Court remanded the case for a determination of whether there was any prejudicial effect on the otherwise valid burglary conviction by reason of the joint trial. However, unlike the situation here with the joined Article 90 charge, there were similar and overlapping elements of proof between the larceny and burglary charges. Some of those elements which might have been related but inadmissible as evidence of guilt on the burglary charge may have been introduced as relevant evidence on the larceny charge. Further, joinder of the charges may have inhibited defendant's ability to offer exculpatory testimony on the burglary count. Similarly the joinder of the two related charges may have indicated to the jury a propensity to engage in such conduct. Consequently, substantial potential for prejudice inhered in the very nature of the joinder there reviewed.
 
 
 203
 An interesting hybrid of these two types of cases is revealed in the case relied upon by the majority-United States ex rel. Hetenyi v. Wilkins, 348 F. 2d 844 (2d Cir. 1965), cert. denied, 383 U.S. 913, 86 S.Ct. 896, 15 L.Ed.2d 667 (1966). There, the court faced a petitioner who had been tried once for first degree murder and had been convicted of second degree murder. On appeal, the state court reversed his conviction. In a subsequent trial, he was again charged with first degree murder and found guilty of second degree murder. On collateral attack, the court of appeals annulled the conviction as having been obtained in violation of petitioner's right against double jeopardy. In making its review, the court applied the "reasonable possibility of prejudice" standard set out in Fahy.
 
 
 204
 I submit that that situation differs markedly from the one before us. The entire proceeding in Hetenyi was a product of a violation of defendant's constitutional right against double jeopardy. The second trial was grounded upon the constitutionally tainted charge-first degree murder, and it was only because of the doctrine of lesser included offenses that the jury was able to bring in a lesser conviction. However, none of these various elements appear in the instant case. The evidence which was introduced as to defendant's criminal conduct under the two unconstitutional articles was completely separable from the evidence used to convict on the Article 90 charge. Further, there is ample indication that the court-martial did in fact separate out the elements of the various charges and brought in independent convictions on the unrelated counts. Additionally, Captain Levy could have exercised his right to take the stand and testify only concerning the Article 90 charge without waiving his right not to testify on the other charges. Consequently, his ability to offer personally exculpatory evidence was not infringed by reason of the joinder. In fact, the law officer carefully made clear to defendant that he had the right to select those charges on which he would and would not testify. Finally, because of our limited scope of review in military habeas corpus, we should stay our hand unless the requisite prejudice is established. In light of these considerations, I cannot agree with the majority that the applicable standard of review as to the Article 90 charge is whether there is a "reasonable possibility of prejudice." Rather, I believe the applicable standard of review should be whether defendant's right to a fair trial on the Article 90 charge was substantially prejudiced by its joinder with the unrelated unconstitutional charges.
 
 
 205
 Applying this standard of review, the critical determination becomes whether the joinder of the charges affected the ability of the fact finders to separate out the component charges and to make a factual determination of guilt on the Article 90 charge based solely on the evidence relevant to that charge. Even assuming the burden of proof to be on the Government, after an extensive examination of the record, I am satisfied the joinder of the charges at trial did not substantially prejudice Captain Levy's constitutional right to a fair trial on the Article 90 charge.
 
 
 206
 I consider four points dispositive in reaching this conclusion. First, defendant never contended that he obeyed the order. Nor was any rebuttal offered to the Government's proof that the order was not obeyed. Therefore, the courtmartial could find conclusively that the order in fact was not obeyed.
 
 
 207
 Secondly, I note that the court-martial was presented with overwhelming evidence that the order did not have as its primary motive the increasing of defendant's punishment. Not only did the court-martial have the benefit of extensive testimony by Colonel Fancy, the commanding officer of the hospital, who gave the order, but it had the benefit of examining the order of events in reaching a sustainable conclusion on this point. These events showed that while the order was given in early October, Colonel Fancy continued his efforts to persuade Captain Levy to comply with the order even after the initial refusal to obey. Only after several attempts at such persuasion had been rejected by Captain Levy did Colonel Fancy finally press charges. Colonel Fancy initiated this action in November, a month after the giving of, and initial refusal to comply with, the order. The court was not presented with a situation where the order was given one day and the charges drawn up the next.
 
 
 208
 Thirdly, of the five charges and specifications brought against Captain Levy under the three Articles-90, 133 and 134, the court-martial brought back verdicts consistent with the indictment on only the three charges here under review. On the two remaining charges, the court brought in verdicts for lesser offenses, tantamount under the UCMJ to an acquittal on those charges. However much the majority may discount it, this shows a discrimination by the members of the court-martial as to the evidence relating to the various charges; such discrimination is extremely relevant in light of the presence of the other elements which I find militate in favor of upholding this conviction.
 
 
 209
 Fourthly, much of the allegedly inflammatory evidence introduced at trial was brought out by the defense in its effort to prove the improper motivation behind the order. On retrial, I do not see how an effective defense to the Article 90 charge could be predicated upon this ground without a similarly exhaustive examination of this subject matter by defense counsel.
 
 
 210
 This last conclusion is not based upon mere speculation as to what might happen, as contended by my colleagues. Rather, it is based upon a frank examination of applicable military law. Captain Levy defended on three grounds. None of these involved the defense that he attempted to obey the order; instead, they were exculpatory defenses for his failure to obey the order.
 
 
 211
 The third defense raised-that the order was against medical ethics-would not appear to be a valid defense under the UCMJ. Further, I agree with the majority's conclusion that the law officer's refusal to recognize this defense raises no substantial constitutional question. The second defense-that defendant was ordered to commit war crimes -was decided adversely to defendant as a matter of law outside the hearing of the court-martial; elements of the third defense could conceivably be subsumed into the second. I do not understand the majority to contend that the law officer was prejudiced in his conduct of the trial by the joinder of charges into one trial, nor do I believe such a position sustainable. Neither do I think the refusal to recognize this second defense resulted in constitutional error. Thus, defendant was relegated-and at a future trial would be relegated, accepting the validity of the law officer's conclusions on the war crimes issue as we must-to predicating a successful defense upon proving the order was illegal because given primarily to increase punishment-the first defense. Because of this, because of the overwhelming evidence against defendant on this point the first time around, and because the joinder of charges did not prejudice Captain Levy's right to offer testimony in defense to this charge only, I conclude that no substantial prejudice to Captain Levy's constitutional right to a fair trial on the Article 90 charge appears on this record.
 
 
 212
 B. Having made this initial determination, the next issue is whether the presumption of validity which attaches to the general sentence under the Claasen rule is rebutted. Claasen v. United States, 142 U.S. 140, 12 S.Ct. 169, 35 L. Ed. 966 (1891).[2] If there be a valid charge found on review, and the general sentence imposed does not exceed the statutory maximum which could be imposed on that charge, a presumption attaches that the court sentenced only on the valid charge. Therefore, the test becomes whether, from direct evidence on the record, the presumption of validity which here attaches to the general sentence is rebutted by the court-martial's consideration of the valid Article 90 conviction together with the two constitutionally invalid convictions for sentencing purposes.
 
 
 213
 This is to be distinguished from the initial determination made in (A). There, the issue was whether the joinder of the charges prejudicially affected the ability of the fact finders to separate out the particular charges and to make a factual determination as to the Article 90 charge solely on the evidence relevant to that charge. Here, however, the question is whether there is affirmative evidence on the record that once a determination of guilt was made as to each of the charges, the court-martial considered the invalid convictions together with the valid Article 90 conviction in arriving at the general sentence ultimately imposed.
 
 
 214
 It is to be emphasized that much more is required to rebut the presumption than the mere fact that the court-martial retired to consider the sentence having all three convictions before them. Rather, strong and convincing evidence rebutting the presumption under Claasen would have to appear on the face of the record; the burden of proof is on the defendant. Absent such evidence, the presumption becomes conclusive in this case since the three year general sentence imposed was within the statutory maximum available for conviction under Article 90. In my scrutiny of the record, I have not found any such direct manifestation of impropriety in the sentencing sufficient to rebut the Claasen presumption. Consequently, I find no basis on which to vacate this sentence.
 
 
 215
 In short, I believe this record reflects no substantial prejudice to defendant by reason of a joint trial on all the charges; neither do I find the presumption attaching to the general sentence rebutted. Thus, while I agree with the majority that Articles 133 and 134 are unconstitutional, I find the Article 90 conviction unimpugned. Therefore, I would affirm the judgment of the district court denying the writ.
 
 
 
 [1]
 Additional specifications under Articles 133 and 134 included:
 Additional Charge II: Violation of the Uniform Code of Military Justice, Article 133.
 DA GGMO NO. 1 17 January 1969
 Specification: In that Captain Howard B. Levy, United States Army, Headquarters and Headquarters Company, United States Army Hospital, Fort Jackson, South Carolina, with intent to impair and interfere with the performance of a member of the military forces of the United States, did, at or near Columbia, South Carolina, on or about September 1965, conduct himself in a manner unbecoming an officer and gentleman by wrongfully and dishonorably communicating by mailing to Sergeant First Class Geoffrey Hancock, Jr., a member of the United States Army then stationed in Viet Nam, and known by the said Captain Howard B. Levy to be so stationed, but not personally known to him, a letter written by his (Levy's) own hand containing the following statements:
 "Dear Geoffrey:
 "Let me begin by introducing myself. My name is Howard Levy. I am an Army Dermatologist at Fort Jackson, S. C. . . . I would not attempt to contest your views on the military situation there although I would suggest that you read (if you have not already done so) Jules Roy's book, 'The Battle of DienBienPhu'. I am, however, deeply distressed at your reasons for fighting in Viet Nam. I am one of those 'people back in the States' who actively opposes our efforts there & would refuse to serve there if I were so assigned. . . ."
 "The only question that remains, is essentially 1) were we merely naive and therefore did we make unintentional mistakes or 2) does the U. S. foreign policy represent a diabolical evil. As you would guess, I opt for the second proposition. . . ."
 "Is Communism worse than a U. S. oriented Government? . . . . Are the North Viet Namese worse off than the South Viet Namese? I doubt it. . . ."
 "Geoffrey who are you fighting for? Do you know? Have you thought about it? You're real battle is back here in the U. S. but why must I fight it for you? The same people who suppress Negroes and poor whites here are doing it all over again all over the world and your [sic] helping them. Why? You, no doubt, know about the terror the whites have inflicted upon Negroes in our country. Aren't you guilty of the same thing with regard the Viet Namese? A dead woman is a dead woman in Alabama and in Viet Nam. To destroy a child's life in Viet Nam equals a destroyed life in Harlem. For what cause? Democracy, Diem, Trujillo, Batista, Chang Kai Shek, Franco, Tshombe-Bullshit? . . ."
 "I would hasten to remind you that despite your obvious courage and enthusiasm Viet Nam is not our country and you are not a Viet Namese. At least the Viet Cong have that on their side. . . . Geoffrey these people may not be sophisticated (American Style) but their [sic] grown men and women who have a right to live and choose their own government. You know they're even allowed to make a mistake -at least let them make it-don't make it for them. . . .",
 or words to that effect.
 Additional Charge III: Violation of the Uniform Code of Military Justice, Article 134.
 Specification: In that Captain Howard B. Levy, United States Army, Headquarters and Headquarters Company, United States Army Hospital, Fort Jackson, South Carolina with intent to interfere with, impair, and influence the loyalty, morale, and discipline of the military forces of the United States, did at or near Columbia, South Carolina, on or about September 1965, advise, counsel, urge and attempt to cause insubordination, disloyalty and refusal of duty by a member of the military forces of the United States by communicating by mailing to Sergeant First Class Geoffrey Hancock, Jr., a member of the United States military forces then stationed in Viet Nam, and known by the said Captain Howard B. Levy to be so stationed, but not personally known to him, a letter written by his (Levy's) own hand containing statements to the following effect: (1) advocating opposition to the United States involvement in the Viet Nam war; (2) describing United States foreign policy as a "diabolical evil" designed more to protect selfish American business interests than to contain the threat and aggression of world Communism; (3) characterizing the United States position and the policy in Viet Nam as a suppression of Negroes and poor whites; (4) praising Communists, and Communist countries, including North Viet Nam and the Viet Cong as being better than the United States and the United States oriented countries; (5) declaring that he (Levy) would refuse to serve in Viet Nam, and that he has actively opposed the United States involvement in Viet Nam; (6) encouraging Sergeant First Class Geoffrey Hancock, Jr., to give up his involvement and commitment as a United States serviceman fighting in Viet Nam, and to return to the United States to fight for the cause of the suppressed Negroes and poor whites; (7) ridiculing and criticizing Sergeant First Class Geoffrey Hancock, Jr.'s motive for being in Viet Nam, stating that Sergeant Hancock does not have the best interests of the Viet Namese people at heart, in violation of Title 18, Section 2387 United States Code, June 25, 1948, Chapter 645, 62 Statutes 811, amended May 24, 1949, Chapter 139, Section 46, 63 Statutes 96, a Statute of the United States of America.
 
 
 [2]
 United States v. Levy, C.M. 416, 463, 39 C.M.R. 672 (1968), petition for review denied, No. 21, 641, 18 U.S.C.M.A. 627 (1969)
 
 
 [3]
 Levy v. Corcoran, 128 U.S.App.D.C. 388, 389 F.2d 929, application for stay denied, 387 U.S. 915, 87 S.Ct. 2026, 18 L.Ed.2d 968, cert. denied, 389 U.S. 960, 88 S.Ct. 337, 19 L.Ed.2d 369 (1967); Levy v. Resor, 17 U.S.C.M.A. 135, 37 C.M.R. 399 (1967); Levy v. Resor, Civ. No. 67-442 (D.S.C. July 5, 1967), aff'd per curiam, 384 F.2d 689 (4th Cir. 1967), cert. denied, 389 U.S. 1049, 88 S.Ct. 789, 19 L.Ed.2d 843 (1968); Levy v. Dillon, 286 F.Supp. 593 (D.Kan.1968), aff'd, 415 F.2d 1263 (10th Cir. 1969)
 
 
 [4]
 Our refusal to apply the general sentence rule is buttressed by a number of considerations unique to the prevailing system of military justice. The record reveals that the law officer instructed the military court not to consider in its determination of a sentence those charges which were dismissed, as this was tantamount to a finding of not guilty as to those charges. This instruction made it perfectly clear that the court should consider only those charges of which Levy was found guilty. It is natural to conclude that the court adhered to this instruction. Therefore, if one or more of the articles under which appellant was convicted and sentenced were unconstitutional, Claasen itself indicates that the general sentence rule is inapplicable: "[I]n the absence of anything in the record to show the contrary, the presumption of law is that the court awarded sentence on the good count only." 142 U.S. at 146-147, 12 S. Ct. at 170. Any validity such a presumption possesses with respect to a civil court, where sentencing is pronounced by a judge skilled in the law, is diluted considerably in the military context, where the court-martial board, which returns the verdict and also pronounces sentence, is composed of non-judicial military officers
 Also militating against our application of the general sentence rule in this particular case is the fact that Articles 133 and 134 rarely stand alone as a basis for prosecution, but rather are usually joined with charges based upon other articles. Application of the general sentence rule would virtually insulate these articles from constitutional scrutiny.
 
 
 [5]
 See, e. g., "Civilian Court Review of Court Martial Adjudications," 69 Colum. L.Rev. 1259 (1969)
 
 
 [6]
 The court stated that the "finality clause" defined the terminal point in a case only within the military justice system, and that such a clause was never intended to act as a suspension of the writ
 
 
 [7]
 Chief Justice Warren, speaking unofficially, described the opinion in Burns as constituting "a recognition of the proposition that our citizens in uniform may not be stripped of basic rights simply because they have doffed their civilian clothes." Warren, "The Bill of Rights and the Military," 37 N.Y.U.L.Rev. 182, 188 (1962)
 
 
 [8]
 Until the Court's decision in Burns, however, Reed did express the controlling law in this area. Only three years before Burns, in Hiatt v. Brown, 339 U.S. 103, 111, 70 S.Ct. 495, 499, 94 L.Ed. 691 (1950), the Court stated: "It is well settled that 'by habeas corpus the civil courts exercise no supervisory or correcting power over the proceedings of a court-martial. . . . The single inquiry, the test, is jurisdiction.' In this case the court-martial had jurisdiction of the person accused and the offense charged, and acted within its lawful powers. The correction of any errors it may have committed is for the military authorities which are alone authorized to review its decision." See also Whelchel v. McDonald, 340 U.S. 122, 71 S.Ct. 146, 95 L.Ed. 141 (1950)
 
 
 [9]
 Admittedly, federal courts have experienced some difficulty in applying the "fully and fairly" test of Burns, and it has been observed that "fully and fairly" has "emerged as a facile phrase, easy to state, but difficult to define and to apply." "Civilian Court Review of Court Martial Adjudications," 69 Colum.L.Rev., supra, at 1262. Contrast, e. g., Application of Stapley, 246 F.Supp. 316, 320 (D.Utah 1965) ("[T]he vindication of constitutional rights . . . transcends ordinary limitations and affords federal courts both the jurisdiction and the duty to inquire and rule upon the legality of detainment of any person entitled to constitutional protection whether in or out of military service."), with LeBallister v. Warden, 247 F.Supp. 349, 352 (D.Kan. 1965) ("Sentences of courts-martial, affirmed by reviewing authority, may be reviewed 'only when void because of an absolute want of power, and are not merely voidable because of the defective exercise of power possessed.' "). See also Hart and Wechsler, The Federal Courts and the Federal System, 2d ed., at 1537. See generally, Note, "Reconsideration of Scope of Review for Habeas Corpus from Military Courts," 11 Duquesne L.Rev. 49 (1972)
 
 
 [10]
 346 U.S. at 139, 73 S.Ct. at 1047. The only support the Court could muster for this statement was Hiatt itself. Indeed, had the Court cited Ex parte Reed, 100 U.S. 13, 25 L.Ed. 538 (1879), holding that the inquiry on habeas from a military proceeding is whether the court-martial had jurisdiction, for its statement that "in military habeas corpus the inquiry, the scope of matters open for review, has always been more narrow than in civil cases," the fallacy of the proposition would have been exposed. Reed was decided during the same Term as Siebold. Yet, the scope of the inquiry devised in Reed for military habeas corpus, was at least as broad as Siebold's inquiry in civil cases. To be sure, following the expanded view of habeas corpus from federal civilian courts taken by Johnson v. Zerbst and Waley, a number of circuits ruled that constitutional claims are cognizable on habeas corpus petitions from military prisoners. Montalvo v. Hiatt, 174 F.2d 645 (5th Cir.) cert. denied, 338 U.S. 874, 70 S.Ct. 135, 94 L.Ed. 536 (1949); Benjamin v. Hunter, 169 F.2d 512 (10th Cir. 1948); United States ex rel. Weintraub v. Swenson, 165 F.2d 756 (2d Cir. 1948); United States ex rel. Innes v. Hiatt, 141 F.2d 664 (3d Cir. 1944); Schita v. King, 133 F.2d 283 (8th Cir. 1943). Similarly, the bald statement in Hiatt that "[t]he single inquiry . . . is jurisdiction," 339 U.S. at 111, 70 S.Ct. 495, failed to attract support from among the lower federal courts. See e. g., Kuykendall v. Hunter, 187 F.2d 545, 546 (10th Cir. 1951); Burns v. Lovett, 91 U.S.App.D.C. 208, 202 F.2d 335 (1952), aff'd sub nom., Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953)
 
 
 [11]
 Although the court has been virtually silent on this subject since its pronouncement in Burns, the Court has accelerated its expansion of the concept of federal habeas corpus from military courts at a much greater pace than its movement from Siebold. The same year the Court decided Hiatt, it indicated that a denial of the opportunity to raise the insanity defense at a court-martial would jeopardize the court-martial's jurisdiction. Whelchel v. McDonald, supra, 340 U.S. at 124, 71 S.Ct. 146
 
 
 [12]
 Such a premise was recognized by this court in United States ex rel. Innes v. Hiatt, 141 F.2d 664, 666 (3d Cir. 1944), where Judge Maris wrote:
 We think that this basic guarantee of fairness afforded by the due process clause of the fifth amendment applies to a defendant in criminal proceedings in a federal military court as well as in a federal civil court. An individual does not cease to be a person within the protection of the fifth amendment of the Constitution because he has joined the nation's armed forces and has taken the oath to support that Constitution with his life, if need be.
 
 
 [13]
 See pp. 776-778, supra
 
 
 [14]
 See generally, Winthrop, Military Law and Precedents, 2d ed. (1920) at 920 (Articles of War of James II, 1688); at 929 (First British Mutiny Act, 1689); at 931 (British Articles of War of 1765); at 953 (American Articles of War of 1775); and at 976 (American Articles of War of 1806)
 
 
 [15]
 Jackman v. Rosenbaum Co., 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107 (1922)
 
 
 [16]
 Neither are we unmindful of this historical context in which these articles were enacted. The Court of Military Appeals in United States v. Howe, supra, 17 U.S.C.M.A. at 174, commented on the development of Article 88, bearing the same chronological features as the articles presently under review:
 [This] was an offense in the British forces at the beginning of our Revolutionary War and was readopted by the Continental Congress. It is significant that it was reenacted by the First Congress of which fifteen of the thirty-nine signers of the Constitution were members, including James Madison, author of the Bill of Rights. It is of even more significance that this provision was readopted by the Ninth Congress in 1806, after the Bill of Rights had been adopted and became a part of the Constitution. This action of Congress constituted a contemporary construction of the Constitution and is entitled to the greatest respect.
 
 
 [17]
 Article 32, the naval counterpart of the present Article 134, read: "All crimes committed by persons belonging to the navy, which are not specified in the foregoing articles, shall be punished according to the laws and customs in such cases at sea."
 
 
 [18]
 Grafton v. United States, 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084 (1907), is wholly inapplicable to our inquiry, it being an appeal by an army private from a conviction by a civil court, after a court-martial determined he had not violated one of the articles
 
 
 [19]
 See also the statement of Justice Douglas in Levy v. Parker, 396 U.S. 1204, 1205, 90 S.Ct. 1, 2, 24 L.Ed.2d 25 (1969), granting appellant Levy's application for bail:
 In O'Callahan v. Parker, 395 U.S. 258 [, 89 S.Ct. 1683, 23 L.Ed.2d 291], which the lower courts did not have before them when they denied bail, we reserved decision on whether Article 134 satisfies the standards of vagueness required by due process. Apart from the question of vagueness is the question of First Amendment rights.
 
 
 [20]
 United States v. Frantz, supra, 2 U.S.C.M.A. at 163. (Emphasis supplied.)
 
 
 [21]
 See also Papachristou v. City of Jacksonville, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1971): "This ordinance is void-for-vagueness, both in the sense that it 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' United States v. Harriss, 347 U.S. 612, 617 [, 74 S.Ct. 808, 98 L.Ed. 989], and because it encourages arbitrary and erratic arrests and convictions. Thornhill v. Alabama, 310 U.S. 88 [, 60 S.Ct. 736, 84 L.Ed. 1093]; Herndon v. Lowry, 301 U.S. 242 [, 57 S.Ct. 732, 81 L.Ed. 1066]
 "Living under a rule of law entails various suppositions, one of which is that '[all persons] are entitled to be informed as to what the State commands or forbids.' Lanzetta v. New Jersey, 306 U.S. 451, 453 [, 59 S.Ct. 618, 83 L.Ed. 888]."
 
 
 [22]
 D. Reynolds, The Officer's Guide, 45 (1969)
 
 
 [23]
 W. Winthrop, Military Law and Precedents, 711 (2d ed. 1920)
 
 
 [24]
 Id. at 713. See generally Note, "Taps for the Real Catch-22," 81 Yale L.J. 1518, 1522-1523 (1972). This identical language, written in 1886, is repeated in the 1968 Manual for Courts-Martial, which sets forth the following advice:
 
 
 [212]
 Article 133-Conduct Unbecoming an Officer and a Gentleman
 Discussion. The conduct contemplated may be that of a commissioned officer of either sex or of a cadet or midshipman. When applied to a female officer the term "gentleman" is the equivalent of "gentlewoman."
 Conduct violative of this article is action or behavior in an official capacity which, in dishonoring or disgracing the individual as an officer, seriously compromises his character as a gentleman, or action or behavior in an unofficial or private capacity which, in dishonoring or disgracing the individual personally, seriously compromises his standing as an officer. There are certain moral attributes common to the ideal officer and the perfect gentleman, a lack of which is indicated by acts of dishonesty or unfair dealing, of indecency or indecorum, or of lawlessness, injustice, or cruelty. Not everyone is or can be expected to meet ideal moral standards, but there is a limit of tolerance below which the individual standards of an officer, cadet, or midshipman cannot fall without seriously compromising his standing as an officer, cadet, or midshipman or his character as a gentleman. This article contemplates conduct by a commissioned officer, cadet, or midshipman which, taking all the circumstances into consideration, is thus compromising.
 
 
 [25]
 See Appendix
 
 
 [26]
 Manual for Courts-Martial, p 213e (1968)
 
 
 [27]
 Manual for Courts-Martial, supra at p 213f
 
 
 [28]
 Working Papers of the National Commission on Reform of Federal Criminal Laws, Vol. 1, at 6 (1970). The basis of this principle is that it violates due process to punish a person for violation of penal laws which are vaguely worded. See, e. g., Article I, Section 9 of the Constitution: "No Bill of Attainder or ex post facto law shall be passed."
 
 
 [29]
 "Repudiation of such fundamental principles of law has been a hall-mark of 20th century totalitarian regimes. Criminal Codes of the various Soviet Socialist Republics originally provided:
 If a socially dangerous act is not directly specified in the Code, the basis and limits of punishment for it shall be determined by applying the sections of the Code which specify crimes of a kind closely resembling the act.
 "Technically called the 'application of penal clauses by analogy,' the same kind of criminal provision was found in Nazi Germany. See Gsovski, Reform of Criminal Law in the Soviet Union (Library of Congress 1960) and Gsovski, The Statutory Criminal Law of Germany (Library of Congress 1947).
 "Under these schemes of law, one's present acts were always subject to the possibility that they might later be declared antisocial. There were no reasonable guides to social conduct. One lived among his countrymen in constant terror. 'Comrad Ivanov . . . was shot last night, in execution of an administrative decision.' Koestler, Darkness at Noon 162 (1941). That was all one needed to know about the law." Working Papers, supra, note 28, at 7.
 
 
 [30]
 Bishin & Stone, Law, Language and Ethics, at 432 (1972)
 
 
 [31]
 Reform of the Federal Criminal Laws, Part III, Subpart C at 1838. Hearings before Subcomm. on Criminal Laws and Procedures of the Senate Committee on the Judiciary, Ninety-Second Cong., 2d Sess., Part III, Subpart C, at 1838 (1972)
 
 
 [32]
 Id., at 1840
 
 
 [33]
 "[A] law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." Giaccio v. Pennsylvania, supra, 382 U.S. at 402-403, 86 S.Ct. at 521
 
 
 [34]
 Note, "Taps for the Real Catch-22," 81 Yale L.J., supra, at 1534
 
 
 [35]
 "Common law crimes, especially those formulated in vague terms, are considered serious threats to liberty." See A. Denning, Freedom Under Law, supra, at 41-42; H. L. A. Hart, Law, Liberty and Morality, 12 (1963)
 
 
 [36]
 Shortly before this opinion was filed, the Court of Appeals for the District of Columbia, per Justice Clark, in Avrech v. Secretary of the Navy, 477 F.2d 1237 (D.C.Cir., 1973), held Article 134 void for vagueness
 
 
 [37]
 See United States v. Zirpolo, 450 F.2d 424, 432-433 (3d Cir. 1971), where we observed that generally, "rulings not primarily designed to enhance the reliability of the fact-finding or truth-determining process have not been applied retroactively." See also Desist v. United States, 394 U.S. 244, 249, 89 S.Ct. 1048, 22 L.Ed.2d 248 (1969), especially criteria (b) and (c)
 
 
 [1]
 Hereinafter cited as UCMJ
 
 
 [2]
 See discussion in majority opinion at 779